Ben B. CONFORD, Appellant,

v.

UNITED STATES of America,
Appellee.

No. 7601.

United States Court of Appeals
Tenth Circuit.

Sept. 11, 1964.

Verl C. Ritchie, Salt Lake City, Utah
(Harden A. Whitney, Jr., Salt Lake City,
Utah, on the brief), for appellant.

William T. Thurman, U. S. Atty., for appellee.

Before BREITENSTEIN, HILL and SETH, Circuit Judges.

HILL, Circuit Judge.

Appellant was tried before a jury and convicted on two counts, each charging him with willfully subscribing to and filing a false income tax return.[1] The two counts covered the tax years of 1956 and 1957. The appeal is from that judgment of conviction entered pursuant to the jury verdict.

The two counts of the indictment alleged in substance: That taxpayer omitted from his 1956 return income received from the sale of Mayday Uranium Company stock and Sundown Petroleum Company stock; that he omitted from his 1957 return income received from the sale of Sundown Petroleum Company stock and claimed a long term capital loss for 1957 in the amount of $8,000, which loss had not occurred.

At the outset, we must frankly state that we find little substance to any of the points raised by appellant on this appeal. We reach that conclusion only after a careful reading and consideration of the entire record below, including the many items of documentary evidence. This is simply a factual case, which was well and carefully presented to the jury by the government, with wholly adequate and legally correct instructions given by the trial judge.

During 1956 and 1957 Conford was president of Mayday Uranium Company and vice president of Sundown Petroleum Company. Both corporations were engaged in uranium and oil promotion and development. Closely associated with taxpayer in both corporations was one Robert Crail, who is frequently referred to throughout the testimony in the case but who could not be located by the government prior to trial for the service of a subpoena. As his defense, Conford contended that he was acting only as a nominee or fiduciary for Crail and others in the various stock transactions reflected by the government's evidence; that the proceeds from the many stock sales did not constitute personal income to him for that reason; and that he claimed the long term capital loss alleged in count two of the indictment in good faith and upon advice from his tax consultant.

The government's evidence shows beyond any doubt that many sales of stock were made through stock brokers in the name of Conford. In a few instances Conford clearly did pay the stock sales proceeds to someone else. But, the stockbroker, through whom Conford sold the stock in question, testified on behalf of the government and from his testimony and books and records there is no question about the sale of stock as contended by the government. Conford does contend that the proceeds from these sales went to others and the government admits that some of it did, but only a small portion. Conford's contention in this regard made his bank records important evidence in the case. An examination of those records shows clearly the flow of most of the stock sale receipts into his bank account and they fail to corroborate his assertion that he paid the proceeds out to others. Rather, those proceeds, or at least the greater part of them, were used by Conford personally and constituted taxable income.

During 1956 the evidence shows fourteen sales of Mayday stock by taxpayer, totaling $10,221. The check for one sale in the amount of $874.75 was endorsed by appellant to Crail, one check in the amount of $149.95 was endorsed to Guss Securities Co., one check in the amount of $300 was endorsed to the Mint Cafe and the others in the total amount of $8,896.30 were either deposited to Conford's personal bank account or cashed by him at the bank upon which they were drawn. Another check for the sale of Mayday stock during that year in the amount of $562.25 was made payable to Floyd Golson, taxpayer's brother-in-law. This check was deposited in taxpayer's

1. 26 U.S.C.A. § 7206(1).

personal bank account. The evidence further shows seven sales of Sundown stock by Conford through the Guss Securities Co. in 1956. The total of these sales amounted to $5,622.90. One of the checks in the amount of $499.75 was endorsed by Conford to Crail, one in the amount of $224.95 was endorsed by Conford to George Haney, one in the amount of $499.75 was deposited by taxpayer in his personal bank account and the other four checks totaling $4,398.45 were cashed by Conford at the bank upon which they were drawn.

During 1957, there is evidence to show sixteen sales of Sundown stock by Conford totaling $13,774.17. Of this amount, $11,049.47 was deposited by Conford in his personal bank account. The balance, $2,724.60, is shown as cash received during that year. Checks made payable to Crail in the total amount of $2,425 were drawn upon the account during the year. There is also evidence showing payment in the amount of $490 during that year to Floyd Golson from these stock sales. Thus, there was deposited in Conford's bank account or received in cash the net sum of $10,859.17. The claimed long-term capital loss for 1957 pertained to a lease on property in Wyoming for uranium exploration and production. The evidence is clear that such a lease was acquired and held by Conford, but it was not sold and it was not forfeited during 1957. No valid claims for such a loss existed during that year. Conford testified that the loss was claimed for that year upon the advice of his tax consultant, but the latter denied that he gave any such advice to appellant. This conflict merely created a question of fact for the jury and such question was resolved against appellant.

■■■■ Viewed in the light most favorable to the government[2] we believe there is substantial competent evidence in the record from which the jury could well find, as it did, that Conford falsified his tax returns for the two years in question.

The government's evidence was presented on the theory of a "specific items" case, which was consistent with the allegations of the indictment. As pointed out by appellant, the government did present evidence to show the receipts and expenditures of money by appellant during the year in question, but this evidence was only introduced for the purpose of corroborating the direct evidence presented to prove the omission of income from the tax returns. The receipts and expenditures evidence certainly strengthened the prosecution's case and weakened taxpayer's position that the income omitted from the returns was actually paid to others by him after receipt of the same. In further support of his position appellant seeks to apply the rule of Holland v. United States, 348 U.S. 121, 75 S.Ct. 127, 99 L.Ed. 150, regarding the essential proof in a "net worth" case. But this is not a "net worth" case or, as stated in appellant's brief, a modified net worth case and therefore the rule laid down in Holland and similar cases is not applicable.

■■■■ Appellant strongly urges error because of the use of the summaries prepared by the revenue agent and given to the jury under particular instructions from the court pertaining to them. This court has sanctioned the use of summaries in numerous cases provided they are accompanied by proper and adequate precautionary instruction.[3] "The preparation and submission to the jury of summaries prepared by an expert is well nigh indispensable to the understanding of a long and complicated set of facts * * *" such as in this case.[4] But when summaries are used and given to the jury, the court must ascertain with certainty that they are based upon and fairly represent competent evidence al-

2. Swallow v. United States, 10 Cir., 307 F.2d 81, cert. denied 371 U.S. 950, 83 S.Ct. 504, 9 L.Ed.2d 499.

3. Swallow v. United States, supra, 307 F.2d at 84, and cases there cited.

4. 10 Mertens, Law of Federal Income Taxation, § 55A.22, p. 88.

ready before the jury.[5] Such summaries, if given to the jury, must be accompanied by appropriate instructions concerning their nature and use.[6] The jury should be advised that the summaries do not, of themselves, constitute evidence in the case but only purport to summarize the documentary and detailed evidence already admitted; that it should examine the basis upon which the summaries rest and be satisfied they accurately reflect other evidence in the case; and that, if not so satisfied, the summaries should be disregarded. In addition, broad cross-examination should be permitted upon the summaries to permit a thorough test of their accuracy. Suffice it so say that we have carefully considered the summaries under attack here, together with all of the other evidence, and conclude that they fairly and accurately summarize evidence already before the jury in other forms. The trial judge carefully instructed the jury concerning the use of the summaries both at the time of their admission into evidence [7] and in the final instructions.[8]

 Lastly, appellant urges that the trial court erred by permitting the introduction of evidence which indicated he had actually forged endorsements on certain checks. These checks were, without dispute, proceeds from the sale of stock. While they were made payable to persons other than Conford, they constituted a part of the amount of money the government contended became taxable income. That evidence clearly showed the flow of stock sale receipts into his personal bank account or for his personal use. It was therefore not error to

---

5. United States v. O'Connor, 2 Cir., 237 F.2d 466.

6. Sanseverino v. United States, 10 Cir., 321 F.2d 714; Swallow v. United States, supra.

7. "* * * I remind the jury again that these are not evidence in the usual sense. They don't purport to be original evidence. They are simply purported summaries or computations of the aggregate items as claimed to be disclosed by the evidence according to the government; and as such, they should be checked first as to the accuracy of the assumptions that the evidence establishes and their foundation. That, after all, is up to the jury, whether the items going to make up the summaries have actually been established by the evidence to the satisfaction of the jury within the rules of law as to burden of proof which I will hereafter give. And, second, there is still open, too, the accuracy of the computations, even assuming, if the jury finds, that the items have been established.

* * * * *

"Now, the jury has the right to consider whether actually the computations are correct, and also the jury has a right to consider whether the assumptions, the items referred to on which the summaries are based, have actually been established by the evidence. And the jury looks, of course, to the evidence itself, using, if the summaries remain in the case, the summaries merely as an aid to computations."

8. "They [the summaries] purport merely to be a totaling or a computation of items claimed by the government to be shown by exhibits and other evidence in the case dealing with the subjects indicated on the respective summaries. In this respect they constitute mere argumentative tools which the prosecution contends support its case. Their effect, if any, depends upon the accuracy and completeness of the totals or computations included, upon whether the independent evidence establishes the claimed bases for the totals and covers all, rather than merely a part, of the type of items or income or disbursements or funds to which reference is made as shown by the evidence and whether reasonable inferences can or should be drawn from these totals and computations which throw light upon material issues in the case.

"Now, these are all matters for your determination as fact finders. Merely because the summary exhibits have been received does not relieve you of the obligation of thus evaluating the summaries; and to the extent that you fairly and reasonably believe that they throw light by way of totals or computations upon the evidence in the case, you may consider them for your convenience, but you have to decide the case upon the the basis and the foundation of the evidence as distinguished from these mere summaries. You may consider them in view of this instruction in connection with all of the evidence that has been received."

admit that evidence. Nor was it error to admit evidence relating to personal loan transactions between appellant and others. This evidence was properly a part of the government's case to show the flow of money into and out of appellant's bank account in corroboration of other evidence in the case showing that he did not, as claimed, pay all of the stock sales money to Crail.

We conclude from the record before us that the appellant received a fair and impartial trial and nothing of a prejudicial nature appears in the record.

Affirmed.