**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Earl D. POLLOCK, Defendant-Appellant.
No. 16352.**

United States Court of Appeals
Seventh Circuit.

May 9, 1968.

Rehearing Denied June 11, 1968.

---

William H. Bowman, Charles F. Higgins, Francis L. McElligott, Milwaukee, Wis., for appellant.

Franklyn Gimbel, Thomas R. Jones, Asst. U. S. Attys., Milwaukee, Wis., for appellee.

Before KNOCH, Senior Circuit Judge, and SWYGERT and CUMMINGS, Circuit Judges.

SWYGERT, Circuit Judge.

Earl D. Pollock appeals from a jury verdict finding him guilty of wilfully attempting to evade and defeat his federal income taxes for the years 1957 through 1961, in violation of Int. Rev. Code of

1954, § 7201.[1] The district court sentenced him to concurrent eighteen month terms of imprisonment on each count and fined him a total of $15,000. In seeking a reversal of his conviction. Pollock advances three contentions. First, he claims that the district judge unduly restricted the presentation of his defense by sustaining the Government's objections to several exhibits that he sought to offer in evidence. Second, he claims that he never constructively received the income upon which the Government alleged that he attempted to evade a tax. Third, he claims that "it was error to refer to a lay jury in a criminal prosecution complex and technical determinations heretofore reserved for the skill of the Secretary of the Treasury."

Pollock, an engineer and a lawyer, was employed by the Vilter Manufacturing Company of Milwaukee, Wisconsin. During the taxable years in question and for many years before, he served as Vilter's export manager. Vilter manufactured equipment used in industrial and commercial type refrigeration and air conditioning installations. While Pollock served as Vilter's export manager, the company's annual volume of export business increased from less than a hundred dollars to several hundred thousand dollars. According to Pollock's testimony, this increase in Vilter's export business was due to a particular method of financing export sales which he devised. Initially, a group of over sixty foreign distributors was built up through the assistance of United States commercial attachés overseas. Because of the burdensome import and currency restrictions imposed by foreign governments on prospective purchasers of Vilter equipment, Pollock decided that he could facilitate such purchases if he himself advanced the funds necessary for a given export order prior to its manufacture by Vilter.

Vilter, which did not extend credit on sales to overseas purchasers, required that the price of the equipment be received before it would begin the necessary manufacturing and fabricating steps to fill an order.

After Pollock advanced the required funds and the equipment was ready to be shipped, the services of J. E. Bernard & Company, Inc., a freight forwarder and customs house collector located in Chicago, were employed. Bernard would advance the cost of freight, insurance, and handling and arrange all the documents necessary (export declaration, ocean bill of lading, etc.) to get the Vilter equipment on board ship and on its way to a particular distributor in a foreign country. Once the goods arrived in the foreign country. Bernard would be responsible for securing the permits and drafts necessary to collect the funds owed by the distributor.

According to Pollock's testimony, the amount thus collected by Bernard would usually be greater than the sale price (previously advanced by Pollock) that Vilter charged the distributor for the equipment. The added increment collected from the distributor would correspond to the "profit" that the distributor charged his customer for the Vilter equipment. From the total amount collected, Bernard would deduct the sums it had previously advanced for the freight and insurance plus its commission for performing these services. The remainder of the amount collected from a foreign distributor would be credited to an account at Bernard in the name of Manufacturers Export Company,[2] a sole proprietorship created by Pollock for the collection of funds remitted by the foreign distributors. The testimony disclosed that the disposition of the funds held by Bernard in the Manufacturers Export account was subject to

---

1. The indictment contained five counts, one for each year.

2. Pollock testified that he did not disclose that *he was* Manufacturers Export because it was "very difficult to manage the issuance of credit when they knew the individual back of it." He also testified that he never informed anyone at Vilter (with the exception of a deceased credit manager) of his connection with Manufacturers Export because "the. subject never came up."

the sole and exclusive command of Pollock.

During the time covered by the indictment, Pollock directed Bernard to disburse some of the funds it held by checks to his order, to the order of other individuals he designated, and to the order of Manufacturers Export Company. He also requested Bernard to issue some checks payable to the Vilter Company.[3] Finally, Pollock ordered Bernard to disburse some of the funds back to the foreign distributors.

At the trial, the Government sought to prove its case against Pollock by means of the so-called "specific item" method. In so doing, it introduced specific checks written by Bernard and made payable to either Pollock or Manufacturers Export. Appearing on some of these checks were the endorsements of Pollock. A Government expert witness, aided by summaries introduced in evidence, computed the sums of these checks year by year and indicated the disposition of the funds. The witness then subtracted the amount of financing income reported by Pollock on his income tax return for a given year from the total he had received, and the remainder was what the Government claimed constituted unreported income. From this sum, the Government expert computed the additional income tax which Pollock owed but had not paid. In addition, the Government introduced evidence showing the money applied or spent by Pollock on nondeductible items during the years in question. Some of these amounts were reflected in increases in various checking and savings accounts controlled by Pollock,[4] some were expended in the acquisition of several real estate parcels and the construction of several residential buildings, some were expended for boats, automobiles, life insurance, liquor, department store purchases and a wedding reception. In determining how much was actually expended by Pollock from unreported income, the Government expert testified to a computation by which, from the total amount spent on nondeductible items in a given year, there was subtracted the nontaxable source of funds, the standard or itemized deduction, the allowable exemptions, and the taxable income reported. The expenditures from unreported income, thus computed, greatly exceeded the amount reported by Pollock as taxable income on his return for some of the years in question. Moreover, for each of the years in question, the expenditures from unreported income closely approximated the amount of Pollock's unreported income.

Pollock's principal defense was that the funds here in question collected by Bernard from the foreign distributors and in turn remitted to Pollock at his direction were not Pollock's funds, but rather were those of the foreign distributors. According to Pollock's testimony, the money he received from Bernard was the "profit" of a given foreign distributor on a particular sale of Vilter equipment which he was merely holding for the distributor at his request, "so that they would be better able to use it in the future." This so-called bailment or trust arrangement, whereby Pollock supposedly held the "profits" of various foreign distributors, was not evidenced by any kind of written agreement between the distributors and either Pollock or Manufacturers Export. Pollock did, however, introduce correspondence with one such distributor which indicated that he was in fact holding some money pursuant to the distribu-

3. Vilter, in turn, credited some of these funds to an account on its books in the name of Manufacturers Export. The money thus credited by Vilter apparently represented the return of funds which Pollock had previously advanced on a particular order. As a result, there existed a continually replenished source which Pollock could draw on to finance future orders.

4. The evidence disclosed that the checks from Bernard to Pollock found their way into Pollock's personal checking account, his personal savings account, a Manufacturers Export checking account and a Manufacturers Export savings account. All of these accounts were in Milwaukee financial institutions.

tor's instruction.[5] He also introduced an exhibit from which he testified that during the period here in question, he was instructed to hold "profits" in excess of $300,000 which he claimed belonged to various distributors. In addition, he testified in detail concerning both the operation of this financing plan from its incipiency in 1946 and the movement of funds collected from the foreign distributors between Bernard, Vilter, and himself.

Pollock testified that he never failed to repay a distributor who requested the return of his, the distributor's, "profits" and that the distributors "had a prior claim" to both the money in his various bank accounts and the investments made with that money. He attempted to explain his expenditures on real estate, boats, and automobiles by testifying that as the funds in the checking and savings accounts subject to his control started to build up in 1957, he proceeded "to locate them in places where they would be readily available." He also claimed that the boats and automobiles were purchased for the entertainment of visiting foreign distributors although "they were also used for personal family use." The investment of the distributor's "profits" in real estate, according to Pollock, resulted from a decision that "it seemed a better procedure to have it located here at home where you knew exactly what could be managed by way of liquidating or of getting funds as soon as they were needed." On cross-examination, however, Pollock admitted that Manufacturers Export was not the co-owner of any of the property which he purchased. Likewise, there was no evidence that Pollock provided in any way for the recognition of the distributor's interest in this property.

Having thus summarized Pollock's involved business arrangements, we now consider the errors he advances for reversal. We reject Pollock's first contention that the district judge improperly restricted him in the presentation of his defense by ruling that certain of his proffered exhibits were inadmissible. The first group of exhibits, three in number, claimed by Pollock to have been improperly excluded were offered during the testimony of an accountant who had gone over Vilter's records at Pollock's request. One exhibit claimed to show the amount of checks issued by Bernard to Vilter between 1957 and 1961 which were charged by Vilter to the Manufacturers Export account on its books. Another exhibit purported to show a summary of the transactions in the Manufacturers Export account on Vilter's books between 1957 and 1961. Although each of the summaries prepared by Pollock's accountant reflecting these amounts was ruled inadmissible by the judge, the accountant was permitted, without objection, to testify to the figures appearing on these summaries. In addition, both Pollock and an officer of Bernard testified to the issuance of checks by Bernard to Vilter at Pollock's direction. The other exhibit was, in the words of the accountant, a "very tentative" list showing the distributors to whom "commissions" were due from Pollock over the five-year period. The accountant testified, "I never did make a complete, authoritative list of commissions due." Although this summary sheet was likewise excluded, Pollock had previously been permitted to testify concerning "the amounts of money [profit] that were due the individual distributors" which he claimed he was holding for them. During Pollock's testimony, a summary prepared by Pollock from Vilter's files reflecting these amounts was received in evidence by the judge.

The second group of exhibits claimed by Pollock to have been improperly excluded related to certain stipulations contained in a settlement agreement entered into between Pollock and Vilter in March 1964. This agreement terminated a civil suit instituted by Vilter against Pollock.

---

5. Although Pollock testified that he frequently entertained foreign distributors when they were in Milwaukee, he failed either to call any of these distributors as witnesses or to introduce any depositions taken of them.

The specific stipulation in issue here provided for the assumption by Vilter of an obligation to repay any foreign distributors out of funds and assets Vilter had seized from Pollock.[6] In urging that the district judge erred in his ruling sustaining objections to these exhibits, Pollock claims here, as he did below, that these stipulations served to corroborate his defense that the funds claimed by the Government to be unreported income of Pollock actually belonged to the distributors.

■ We believe that the district judge's ruling that the first group of exhibits was inadmissible, if erroneous at all, amounted to mere harmless error which had no effect on the substantial rights of Pollock. The judge exhibited a great deal of liberality in permitting Pollock to testify and introduce evidence supporting his defense. All of the material contained in the first group of excluded exhibits was before the jury for its consideration through the testimony of Pollock and his accountant and other exhibits introduced by Pollock that were admitted into evidence. United States v. Shavin, 320 F.2d 308 (7th Cir.), cert. denied, 375 U.S. 944, 84 S.Ct. 349, 11 L. Ed.2d 273 (1963); Ballantyne v. United States, 293 F.2d 112 (5th Cir. 1961), cert. denied, 369 U.S. 802, 82 S.Ct. 641, 72 L. Ed.2d 549 (1962).

■ In addition, the district judge properly excluded Pollock's exhibits relating to the civil litigation. In so doing, he stated:

> I don't think we can start dumping into the laps of the jury that whole civil case. This man and company [Pollock and Vilter] have been litigating now, * * * for five years, and this [civil] trial lasted twenty-six days, and we can't incorporate that trial by reference to this trial.

We agree that the terms of the stipulation would have no relevancy unless the issues and proceedings in the civil litigation were considered in detail by the jury. Such an undertaking would have constituted a significant departure and might well have hopelessly confused the jury. Moreover, since Pollock's theory of defense was before the jury in great detail through his own lengthy testimony, we do not believe he was prejudiced by the district judge's ruling.

■ Pollock's second contention is that he "never constructively received income upon which it was alleged he evaded taxation." The very tests and cases cited by him in support of this contention demonstrate that it is totally lacking in merit. Irrespective of the arrangement that Pollock claimed to have had with the foreign distributors by which he ostensibly served as a mere bailee of their "profits," the unrebutted evidence in the record demonstrates that he appropriated the funds in question to his own use, expending them on real estate, boats, automobiles and other things. The use of this money, which was subject to Pollock's sole control unrestricted by any understanding establishing the interest of the distributors in it, is entirely inconsistent with his claimed bailment theory. On the basis of the evidence, the jury was entitled to conclude that the money in question, treated by Pollock as his own, constituted income to him which he should have reported and on which he should have paid taxes. See Conford v. United States, 336 F.2d 285 (10th Cir. 1964).

Pollock's remaining contention is without merit. Fed.R.Crim.P. 23.

The judgment of conviction is affirmed.

6. The stipulation in issue read:
Plaintiffs agree to hold Defendants Earl D. Pollock, * * * and Manufacturers Export Company harmless from any claims of plaintiffs' distributors against said defendants for any amounts arising from sales, transportation and insurance of plaintiffs' products.