949 F.2d 398
 NOTICE: Seventh Circuit Rule 53(b)(2) states unpublished orders shall not be cited or used as precedent except to support a claim of res judicata, collateral estoppel or law of the case in any federal court within the circuit.
Charles YEKSIGIAN, Plaintiff/Appellant,
v.
Ralph NAPPI, Howard Nicholas, and City of Chicago,
Defendants/Appellees.
 No. 91-1253.
 United States Court of Appeals, Seventh Circuit.
 Argued Oct. 1, 1991.
Decided Dec. 9, 1991.
 
 Before CUDAHY, RIPPLE, and KANNE, Circuit Judges.
 
 ORDER
 
 1
 Charles Yeksigian sued his two supervisors, Ralph Nappi and Howard Nicholas, and the City of Chicago following an incident in which he was arrested for refusing to leave his place of work after being ordered to do so. Mr. Yeksigian brought this action in the district court claiming a violation of his civil rights protected by 42 U.S.C. § 1983, in addition to pendant state claims alleging malicious prosecution and false arrest under Illinois law.[1] The case was tried to a jury which returned verdicts for the defendants on all three counts. Mr. Yeksigian brought a motion for a new trial. He claimed that the district court erred in admitting evidence concerning the administrative appeal, reviewed by a state circuit court, that upheld two suspensions which he received for the incidents on the day of his arrest. The district court denied the motion. This appeal follows.
 
 I. BACKGROUND
 
 2
 Mr. Yeksigian is a journeyman electrician who has worked for the city of Chicago at O'Hare Airport since 1962. On December 14, 1987, Mr. Yeksigian reported for his regular shift of work at 8:00 a.m. at the heating and refrigeration building (H & R) which regulates and controls all the heating, air conditioning and refrigeration systems at the O'Hare complex. Shortly before 12:00 noon, defendant Nappi and co-worker Frank Guzzo observed Mr. Yeksigian driving away from the H & R building. Not knowing where Mr. Yeksigian was going, Nappi asked several co-workers, one of whom stated that Yeksigian said he needed to check a project at another building, the RB 40 building (RB 40). Approximately 20 minutes later, Nappi sent Guzzo to RB 40 to see if Yeksigian was there. Guzzo found the front gates locked, and reported that Yeksigian was not there. Shortly before 1:00, Nappi observed Mr. Yeksigian return in his vehicle from the Kennedy expressway. Because electricians in this unit were required to be available for any emergencies during their entire shift, they were not allowed to leave airport grounds without permission. Therefore, Nappi, who had not given Mr. Yeksigian permission to leave, asked Mr. Yeksigian where he had been. Mr. Yeksigian stated that he was at RB 40. Nappi asked where he had been before that, and Yeksigian again replied that he was at RB 40. Upon further inquiry, Mr. Yeksigian told his supervisor, Nappi, that it was none of his business.[2] At trial, Yeksigian testified that he drove his truck first to RB 40, and, upon finding the employees of that building at lunch, drove his truck to the main terminals to go to lunch.[3] After lunch, he returned to RB 40 to complete his work and then returned to R & H. Mr. Yeksigian never told Nappi that he went to the terminal building for lunch.
 
 
 3
 Yeksigian admitted at trial that he became fairly agitated after Nappi's initial questions. Nappi then ordered Mr. Yeksigian to go home. Mr. Yeksigian, believing that Nappi lacked the authority to send him home without a written suspension, refused to leave and returned to work.[4] Nappi testified that he believed that Mr. Yeksigian was unpredictable and volatile, an opinion based on past events involving Mr. Yeksigian, and that he could be a threat to others' safety and to airport operations. Therefore, he phoned his supervisor, Howard Nicholas, Deputy Commissioner of the Department of Aviation, for advice. The two agreed that the best way to handle the situation was to get Mr. Yeksigian off the premises. Nappi phoned the Chicago police who sent officer Ronald Kirby and another unidentified officer to the scene.
 
 
 4
 Officer Kirby testified that Nappi told him that Mr. Yeksigian was ordered to leave and was an unauthorized presence at the worksite. Nappi told him that he feared Mr. Yeksigian would perform unauthorized electrical work which could cause a safety hazard. Officer Kirby asked Nappi if he would be willing to sign a complaint against Mr. Yeksigian, and Nappi agreed to do so. Officer Kirby also spoke to Nicholas who concurred in this decision. The complaint, which officer Kirby wrote and Nappi signed, stated that Mr. Yeksigian had been suspended for leaving the job site without authorization and refused to leave the premises when ordered.[5] At approximately 1:30 p.m., Yeksigian was seen approaching the building in which Nappi had his office. Officer Kirby then spoke with Mr. Yeksigian and explained the allegations against him. Mr. Yeksigian then peaceably accompanied the officer to his police car. He was formally arrested.
 
 
 5
 When Mr. Yeksigian returned to work the next morning, he was given two suspension notices for the events of December 14. One suspension charged that he left the airport grounds without the requisite permission. The other suspension charged Mr. Yeksigian with insubordination for refusing to obey an order, the order to leave the premises.
 
 
 6
 In order to prevail on his claims, Mr. Yeksigian needed to prove that Nappi made false statements to the police officer to cause his arrest. Mr. Yeksigian contended that the false statements included assertions that he had been suspended, that his conduct was disorderly and that his presence at the worksite constituted a safety hazard. Mr. Yeksigian argued that Nappi lied by telling Officer Kirby that Mr. Yeksigian had been suspended, when in reality, he was not officially suspended until the day following the arrest. Mr. Yeksigian introduced sections of the Personnel Rules to show that suspensions must be in writing and offered the written December 15 suspension notices for the limited purpose of demonstrating that he was not suspended on the day he was arrested.[6] In this regard, he testified as follows on direct examination:
 
 
 7
 Q. Were you familiar with what the procedures were under the City of Chicago personnel rules with regard to suspensions at that point?
 
 
 8
 A. Yes, sir.
 
 
 9
 Q. And did you have any opinion at that point as to whether Mr. Nappi was conforming with those rules?
 
 
 10
 A. I didn't think he was. He had--he hadn't handed me a suspension notice. (TR at 29).
 
 
 11
 .............................................................
 
 
 12
 ...................
 
 
 13
 * * *
 
 
 14
 Q. Now, did you go to work the next day? ...
 
 
 15
 A. Yes. My intentions were to work that day.
 
 
 16
 Q. But then you were given suspensions, is that correct?
 
 
 17
 A. Well, I was told to wait, that Mr.--that Nappi was going to go get the suspensions typed up and signed by Mr. Nicholas. I waited for about an hour and a half. The union representative was there. I had called him that night.
 
 
 18
 While I was waiting the hour and a half, I filled out grievances against Nappi. Approximately 9:00 o'clock, 9:30, he came back with the suspensions, unsigned by Mr. Nicholas because Mr. Nicholas didn't make it to work that day because of a snowstorm, and I accepted the suspensions and then went home. (TR at 34-35).
 
 
 19
 Mr. Yeksigian also attempted to demonstrate that Nappi's actions were motivated by his personal dislike of the plaintiff. This improper motive bolstered Mr. Yeksigian's argument that Nappi lied to the police officer. To this end, he introduced evidence of prior suspensions issued by Nappi. The following colloquy took place during Mr. Yeksigian's direct examination:
 
 
 20
 Q. Now, during the periods from when you started with the City in 1961 until September of 1987, had you ever had any disciplinary actions against you?
 
 
 21
 A. No, sir.
 
 
 22
 Q. And I'm showing you what's been marked Plaintiff's Exhibit No. 1. Can you tell us what that is.
 
 
 23
 A. I believe it's a copy of my personnel record from the City of Chicago, Department of Personnel....
 
 
 24
 Q. And in the fall of 1987, Mr. Nappi was your foreman, is that correct?
 
 
 25
 A. Yes, sir.
 
 
 26
 Q. When did he become your foreman? ...
 
 
 27
 Q. Well, during--when did he come back as your foreman?
 
 
 28
 A. I believe in September of 1987.
 
 
 29
 Q. All right. And did you--then after Mr. Nappi came back then as your supervisor in 19--in September of '87, did you have any difficulties with him at that time as far as you job performance?
 
 
 30
 A. Yes, I did.
 
 
 31
 Q. And did you have any disciplinary actions against you at that time?
 
 
 32
 A. Yes, I did.
 
 
 33
 Q. Can you tell us what they were.
 
 
 34
 A. I--
 
 
 35
 Q. Well, without telling us the story of it. How long were they?
 
 
 36
 A. They were, I think 15 days' suspensions at that time.
 
 
 37
 Q. A total of two?
 
 
 38
 A. I believe so, or ten days, five days each. I'm not sure of what they were. (TR at 22-23).
 
 
 39
 In addition, Mr. Yeksigian introduced the evidence that he was not officially suspended until the day after his arrest in an attempt to show that Nappi failed to follow "proper procedure" in ordering Yeksigian to go home.[7]
 
 
 40
 On cross-examination, the defendants inquired, over objection, about the administrative and judicial review Mr. Yeksigian received after imposition of the December 15 suspensions. Mr. Yeksigian was asked whether, during the administrative hearing, he had been "given the opportunity to testify, to tell your side of the story" and whether "the suspensions were upheld by the personnel board after they heard all the evidence". Mr. Yeksigian responded affirmatively. (TR at 37-38). Mr. Yeksigian was also asked whether he argued to the personnel board "that Nappi had no authority to do what he was doing". The plaintiff replied that he thought he argued that point. (TR at 47). In response to objections challenging the relevance of this evidence, the trial court held that Yeksigian had "opened the door" to these questions.
 
 
 41
 On re-direct examination, Mr. Yeksigian stressed the fact that he was not formally suspended prior to his arrest. Mr. Yeksigian also testified that his arrest was not an issue before the personnel board. (TR at 46-47).
 
 
 42
 In closing argument to the jury, the defense argued that Mr. Yeksigian should have used the personnel procedures available to him instead of refusing to leave the premises. The defendants' counsel stated:
 
 
 43
 Now, about those procedures, you heard testimony that he did follow through on those. He did file grievances, and he did have a hearing on this very issue, because he was suspended the next day....
 
 
 44
 Now, he appealed that. He didn't agree with that. And he made his arguments to the personnel board of the City of Chicago. They upheld the suspension.
 
 
 45
 He didn't agree with the personnel board. He went to the Circuit Court of Cook County. They upheld the suspensions. He argued the Mr. Nappi did not have the authority to do what he did. They didn't agree.
 
 
 46
 (TR at 167-68).[8] Defense counsel also argued that the word "suspension" found in officer Kirby's report reflected the officer's interpretation of Nappi's statement that Mr. Yeksigian was an "unauthorized presence", but did not prove that Nappi falsely informed the officer that Mr. Yeksigian had been suspended. The defendants further argued that their fear that Mr. Yeksigian could present a safety hazard was founded on their knowledge of his past actions, particularly an incident which occurred days earlier in which a co-worker ended up in the hospital. As such, these statements were not false.
 
 
 47
 The jury returned a verdict in favor of defendants Nappi and Nicholas on all counts. The question of the city's liability was never presented to the jury. Similarly, the district court entered judgment in favor of defendants Nappi and Nicholas.
 
 II. ANALYSIS
 A. Appellate Jurisdiction
 
 48
 The district court only entered judgment on behalf of the individual defendants. Nothing in the record specifically states the judgment was entered for the City of Chicago. As such, there is a question of whether the district court entered a final appealable order disposing of all the parties.
 
 
 49
 The City's liability depended upon a finding that the individual defendants were liable. When the jury returned verdicts in favor of Nappi and Nicholas, there could be no liability on the City's part. Although judgment was not entered as to the City, it is clear that the district court and the parties regarded the judgment against the individual defendants as the final disposition of the entire case. "If it appears that the district court intended the dismissal to dispose of the action, it may be considered final and appealable." Rothner v. City of Chicago, 929 F.2d 297, 300 (7th Cir.1991) (quoting Gerritsen v. de la Madrid Hurtado, 819 F.2d 1511, 1514 (9th Cir.1987)). Thus, we have jurisdiction over this appeal.
 
 B. Admission of Evidence
 
 50
 "Our standard of review in determining whether the district court committed reversible error in the admission or exclusion of evidence is abuse of discretion." Geitz v. Lindsey, 893 F.2d 148, 150 (7th Cir.1990). The district court's balancing of probative value and unfair prejudice is entitled to great deference. Similarly, we shall not reverse a district court's denial of a motion for new trial unless a clear abuse of discretion is shown. Cygnar v. City of Chicago, 865 F.2d 827, 835 (7th Cir.1989). This deference is justified by the institutional roles that trial courts and appellate courts play in the administration of justice. Of course, we must remember that one function of the appellate court is to take the long, unruffled view of an issue that the trial court must decide--necessarily--with greater speed. Consequently, no disrespect for the judgment of our colleagues on the trial bench is intended, or ought to be implied, when, occasionally, we assess the impact of an evidentiary ruling in a different light than the trial court. Our review is deferential, but it is review nonetheless.
 
 
 51
 Federal Rule of Evidence 401 defines relevant evidence as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable than it would be without this evidence." Federal Rule of Evidence 403 provides:
 
 
 52
 Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.
 
 
 53
 Mr. Yeksigian claims that the admission of evidence concerning the administrative and judicial affirmance of the suspensions was error. He argues that the evidence is irrelevant to the main issue in this case: whether the defendants provided false information to cause Mr. Yeksigian's arrest. He claims that the evidence unfairly allowed the jury to infer that this issue had already been decided against Mr. Yeksigian, although the truth of the information given to the officer was not an issue at the administrative hearing.
 
 
 54
 We agree with Mr. Yeksigian that the central issue before the state tribunals was different from the central issue before the district court in this litigation. Nevertheless, evidence that the suspensions were upheld was admissible. It did not establish conclusively whether Nappi lied to the officer. However, it was of assistance to the jury in assessing Mr. Yeksigian's submission that Nappi harbored personal animus against him and, despite the lack of authority to issue such an order, ordered him to go home. Mr. Yeksigian had introduced evidence that, if believed by the jury, would have supported such a characterization of Nappi's actions. The defendants were entitled to demonstrate that Nappi's actions were upheld on review by higher state authority. Such evidence supports their position that Nappi acted within the scope of his authority and not out of personal animus. The jury was left to decide, on all the evidence presented, whether Nappi told the officer that Mr. Yeksigian was suspended (when he was not) and whether Nappi actually believed that Mr. Yeksigian's presence was a safety hazard. Cf. Perry v. Larson, 794 F.2d 279 (7th Cir.1986) (evidence of unrelated arbitration admitted not to show propriety or impropriety of dismissal at issue but motive of person involved).[9]
 
 
 55
 Accordingly, on this record we cannot say that the district court abused its discretion when it permitted the testimony.
 
 
 56
 Accordingly, the judgment of the district court is affirmed.
 
 
 57
 AFFIRMED.
 
 
 
 [1]
 In an earlier appeal, this court reversed the district court's dismissal of this suit for failure to state a claim upon which relief can be granted pursuant to Federal Rule of Civil Procedure 12(b)(6). Yeksigian v. Nappi, 900 F.2d 101 (7th Cir.1990)
 
 
 [2]
 The parties disputed the exact words used by Mr. Yeksigian
 
 
 [3]
 The employees were allowed to eat their lunch in the main terminal. It was practice, however, not to drive to the terminals, but to take underground tunnel transportation
 
 
 [4]
 Mr. Yeksigian's testimony differs somewhat from this characterization of events. He claims that, before he was even asked about his whereabouts, Nappi told him that he had been signed-out and should go home
 
 
 [5]
 Nappi testified that the complaint was blank when he signed it. Therefore, he did not read the summary stating that Mr. Yeksigian was suspended. Officer Kirby, on the other hand, testified that Nappi came to the airport security building and signed the fully filled out complaint at that location
 
 
 [6]
 Prior to trial, the parties submitted a list of exhibits which they jointly agreed were admissible, as well as written objections to other exhibits sought to be admitted by the opposing party. The parties stipulated to the admission of the December 15, 1987, suspension notices as a joint exhibit. The defense sought to offer excerpts of Yeksigian's hearing before the Personnel Board, the decision of the Personnel Board, the plaintiff's administrative review complaint brought in the Illinois circuit court and that court's decision. Yeksigian objected to the admission of these documents challenging their relevance. Nothing in the record indicates whether the district court ruled on these objections prior to trial
 
 
 [7]
 During opening argument, Yeksigian stated that he would prove that Nappi lacked the authority to order him to go home. In closing argument, Yeksigian simultaneously argued that in the absence of a suspension, that Nappi lacked the authority to order him off the premises, but that the suspensions, themselves, "did not have anything to do with the arrest or the order to go home." (TR at 162)
 
 
 [8]
 Mr. Yeksigian objected, arguing that there was no evidence in the record concerning his arguments before the board. As already noted, Mr. Yeksigian testified on cross-examination that he believed that he challenged Nappi's authority to send him home without a written suspension at the personnel proceedings. Therefore, Yeksigian's arguments on these points are untenable
 
 
 [9]
 The cases cited by Mr. Yeksigian do not help his case. In United States v. Pollock, 394 F.2d 922 (7th Cir.1968), this court reviewed a conviction for tax evasion and upheld the exclusion of one stipulation from a prior civil litigation involving some of the same issues. In excluding this evidence, the court found that the evidence would have no relevancy unless the prior proceeding, which was a 26 day trial, was explained in detail. This court held that the incorporation of the earlier trial "would have constituted a significant departure and might have hopelessly confused the jury." Unlike Pollock, comment on the administrative and judicial review was not a complex matter which could have confused the jury
 Similarly, this court's decision in Pucalik v. Holiday Inns, Inc., 777 F.2d 359 (7th Cir.1985), is not controlling. We upheld the district court's exclusion of a federal agency's determination for federal benefits. First, we noted that the federal program employed different legal standards than the Indiana law which applied to the case. The court also noted that evidence concerning these benefits would violate an Indiana law which precludes introduction of payment from other sources to mitigate damages. Again, the evidence in Pucalik was much more complicated and likely to cause confusion than the evidence Mr. Yeksigian challenged.