Michael Moses SCHNEIDER also known as Nguyen Phi Khanh, a minor who sues by and through his next friends and adoptive parents, Gary and Sandra Schneider, et al.

v.

LOCKHEED AIRCRAFT
CORPORATION,
Appellant,

v.

UNITED STATES of America.

Melissa Hope MARCHETTI also known as Ngo Thi Hoa Thuong, a minor who sues by and through her next friends and adoptive parents, Dennis and Pamela Marchetti, et al.

v.

LOCKHEED AIRCRAFT
CORPORATION,
Appellant,

v.

UNITED STATES of America.

James Matthew ZIMMERLY also known as Do Phi Hung, a minor who sues by and through his next friends and adoptive parents, Melvin E. and Wanda Zimmerly, etc.

v.

LOCKHEED AIRCRAFT CORPORA-
TION, Deft. and Third
Party Pltff.,

and

The United States of America, Third
Party Deft., Appellants.

Nos. 80–1844, 80–1960, 80–2118, 80–1845, 80–1959, 80–2119, 81–1200 and 81–1337.

United States Court of Appeals,
District of Columbia Circuit.

Argued May 12, 1981.

Decided June 17, 1981.

J. Vernon Patrick, Jr., with whom William M. Cohen was on the brief for Zimmerly, et al., appellees in No. 81–1200 and cross-appellants in No. 81–1337, Schneider, et al., appellees in Nos. 80–1844 and 80–2118 and cross-appellants in No. 80–1960, Marchetti, et al., appellees in Nos. 80–1845 and 80–2119 and cross-appellants in No. 80–1959. Charles R. Work, Washington, D.C., also entered an appearance for Zimmerly et al., Schneider, et al., and Marchetti, et al.

Richard M. Sharp, Washington, D.C., with whom William F. Sheehan, Nancy J. Bregstein, and Carroll E. Dubuc, Washington, D.C., were on the brief, for Lockheed Aircraft Corp., appellant in No. 80–1844 and cross-appellee in Nos. 80–1960 & 80–2118. Aidan D. Jones, Washington, D.C., also entered an appearance for Lockheed Aircraft.

Thomas S. Martin, Asst. Atty. Gen., Charles F. C. Ruff, U. S. Atty., William Kanter and Linda Jan S. Pack, Attys., Dept. of Justice, Washington, D.C., were on the brief, for United States of America, appellees in Nos. 80–1844, 80–1845, 80–1959 and 80–1960 and cross-appellant in No. 80–2118 and 80–2119 and appellant in No. 81–120.

Richard M. Sharp, Washington, D.C., with whom William S. Moore, William F. Sheehan, Patrick M. Hanlon and Carroll E. Dubuc, Washington, D.C., were on the brief, for Lockheed Aircraft Corp., appellant in No. 80–1845 and cross-appellee in Nos. 80–1959 & 80–2119.

William F. Sheehan, Washington, D.C., with whom Richard M. Sharp, William S. Moore, Frederick C. Schafrick, Patrick M. Hanlon and Carroll E. Dubuc, Washington,

D.C., were on the brief, for Lockheed Aircraft Corp., appellant in No. 81–1200 and cross-appellee in No. 81–1337. Temple L. Ratcliffe & Aidan D. Jones, Washington, D.C., also entered an appearance for Lockheed Aircraft Corp.

○ Before BAZELON, Senior Circuit Judge, and McGOWAN and ROBB, Circuit Judges.

Opinion for the Court PER CURIAM.

PER CURIAM:

These personal injury actions arose from the explosive decompression and subsequent crash near Saigon, South Vietnam on April 4, 1975 of a Lockheed C5A Galaxy aircraft. The plane was carrying 258 Vietnamese orphans bound for adoptive homes in the United States and abroad. One hundred forty-four of the approximately 327 persons aboard the plane died; 150 orphans survived. One year later, Friends for All Children (FFAC), the nonprofit adoption agency that had originally arranged the flight, filed suit on behalf of the 150 surviving orphans against Lockheed Aircraft Corporation. FFAC claimed that Lockheed's negligence caused the explosive decompression and crash, which in turn caused extensive neurological disorders in the surviving children. Two years later, after much diligent work on the part of the District Court, procedures were developed for the orderly disposition of some 150 related trials. The first three cases were tried by the same trial judge to the same jury. After the third case was completed, the trial judge entered a Comprehensive Pretrial Order designed to govern the remaining related trials. The court then retried the second case, having granted plaintiff's motion for a new

trial in that case pursuant to Rule 59(b), Fed.R.Civ.P.

These four trials and the Comprehensive Pretrial Order are the subjects of the appeals herein. Recognizing that our disposition of these cases bears heavily upon the remaining trials, some of which are now in progress or already completed, we granted the District Court's request for expedited consideration. For the reasons set forth below, we reverse and order new trials in *Schneider, Marchetti, and Zimmerly.*[1]

I

A. "Operation Babylift"

In early 1975, the withdrawal of United States troops from South Vietnam was completed, and the conquest of Saigon by North Vietnamese troops was imminent. The United States Government, working in cooperation with FFAC, conceived of a plan whereby a number of Vietnamese orphans in Saigon orphanages would be flown from Saigon to the United States and there adopted by American families. As the conquest of Saigon became certain, plans for "Operation Babylift" went forward, and a Lockheed-manufactured C5A aircraft (normally used to transport troops and military equipment) was procured for the mission.

On April 4, 1975, approximately 301 passengers (including over 250 Vietnamese orphans) boarded the plane for the flight to the United States. Sixteen crew persons and ten medical personnel also were on the plane. Approximately 152 of the youngest children, primarily infants, were placed in the aft troop compartment and strapped two to a seat. Approximately 106 older orphans were placed in the lower cargo compartment.

Fifteen minutes after takeoff, an altitude of approximately 23,000 feet, the aft ramp locking system of the aircraft failed, and the aft ramp, pressure door, and cargo

1. On May 19, 1981, we issued an order reversing *Schneider, Marchetti,* and *Zimmerly,* and disapproving certain aspects of the Comprehensive Pretrial Order. Our purpose was to halt any ongoing trials in which the judges might be relying upon these three cases or the collateral estoppel portion of the Comprehensive Pretrial Order. We explain our reasons for these holdings within, and, in addition, pass upon several other matters which we thought it unnecessary to reach in our order of May 19, 1981.

doors fell off the aircraft, causing an immediate explosive decompression and a consequent loss of oxygen. The pilot turned back toward Saigon immediately, and crash-landed within 10 minutes. The plane first hit a rice paddy, then became airborne again for a brief period, and finally crashed into another rice paddy, skidding into a dike. At this point, the plane shattered into four large pieces and innumerable small ones. The cargo compartment was crushed and burned, killing nearly all of its occupants. The troop compartment remained intact, although it filled with smoke and fumes; 149 of its 152 orphan passengers survived. Helicopters arrived five minutes later and transported the surviving children to a hospital in Saigon. The next day, most of the orphans were flown to the United States and immediately examined at the Presidio hospital in San Francisco. They were then released to their adoptive parents.

B. Pretrial Proceedings

On April 2, 1976, FFAC filed a complaint in the United States District Court for the District of Columbia against Lockheed Aircraft Corp., representing itself as the legal guardian of 150 named Vietnamese children who had survived the plane crash. FFAC alleged that these children suffered from a syndrome of developmental problems generically classified as Minimal Brain Dysfunction (MBD), which had been proximately caused by the explosion and crash. FFAC charged Lockheed with negligence in the manufacture of the C5A, and grounded plaintiffs' right to recover in tort and breach of warranty.[2] Lockheed filed its answer on April 16, 1976, admitting that the C5A had crashed but disclaiming liability to the infants.

Lockheed then filed a Third Party Complaint against the United States, seeking to add the United States as a third-party defendant on the grounds that the United States' negligence had proximately caused the crash. In its Answer, the United States asserted that Lockheed, not the United States, had negligently caused the accident. In addition, the United States moved to dismiss, asserting that Lockheed's action was barred by 28 U.S.C. § 2680(k), which excepts claims arising in a foreign country from the scope of the Federal Tort Claims Act.

On January 6, 1978, a hearing was held on the motion to dismiss. The district court denied the motion. By later Pretrial Order, however, it granted, over Lockheed's objection, plaintiff's motion to offer as an evidentiary admission a statement made during that hearing by Lockheed's counsel (Plaintiff's Exhibit 109).

On Feb. 23, 1978, FFAC wrote to the adoptive parents of the plaintiffs, suggesting that the parents substitute themselves for FFAC as named plaintiffs in the present cases. Many of the parents had been unaware of the filing of any complaint. The United States moved to have FFAC's counsel disqualified for improper solicitation, and Lockheed moved for summary judgment on the grounds that FFAC lacked capacity to sue on behalf of the children. The trial judge appointed Charles Work, Esq., as *amicus curiae* to advise the court whether counsel for FFAC should be disqualified and whether a guardian *ad litem* should be appointed to sue on behalf of the children.

On the amicus' recommendations, the court denied Lockheed's motion for summary judgment. The court then appointed Mr. Work and his law firm to act in a more permanent capacity as guardians *ad litem*, thereby ameliorating any further ethical problems. At the direction of the court, the guardian informed the parents of all 150 surviving orphans of their right to substitute themselves as named plaintiffs. The parents of 98 of the children have so far

2. This case was assigned to the same District Court judge who had previously been designated by the Judicial Panel on Multidistrict Litigation to handle FFAC's suit on behalf of the deceased orphans, but the new case was treated as a separate cause. *See In re: Air Crash Disaster Near Saigon, South Vietnam, on April 4, 1975,* 404 F.Supp. 478 (Jud.Pan.Mult.Lit. 1978).

exercised this right. Amended complaints were filed on behalf of Michael Schneider on Dec. 21, 1979, Melissa Marchetti on Dec. 21, 1979, and James Zimmerly on Dec. 20, 1979.

Throughout 1978 and 1979 the parties in all three cases engaged in extensive discovery. On Dec. 6, 1979, the parties entered into three stipulations. In the first, plaintiffs agreed not to seek punitive damages, and Lockheed agreed not to contest its liability for the accident in all cases in which amended complaints were filed by parents or guardians. The United States for its part agreed not to contest its liability to Lockheed for indemnification or contribution with respect to compensatory damage awards. Stipulation Nos. 1–3 of Sept. 14, 1979 (*Schneider* J.A. at 169–70).

The second stipulation provided that Lockheed would pay the guardians *ad litem* $5,000 for each legitimate plaintiff, to be used for medical treatment, litigation expenses, and other aids to the individual child. Stipulation No. 2 of Sept. 14, 1979 (*Schneider* J.A. at 167).

The third stipulation provided that Lockheed would pay to each plaintiff "the greater of (a) thirty percent (30%) of the amount of any ... judgment or (b) fifty percent (50%) of the largest settlement offer ... notwithstanding any appeal so taken." Stipulation No. 1 of Sept. 14, 1979 (*Schneider* J.A. at 167).

## C. The Four Trials

The first case to go to trial was *Schneider v. Lockheed Aircraft Corporation.* The six-person jury found by special verdict that the explosive decompression and crash did not *cause* but did *aggravate* Schneider's MBD, and awarded Schneider $500,000 in compensatory damages. By order of April 22, 1980, as amended by Orders of July 16 and 18, 1980, the District Court awarded plaintiffs a judgment in the amount of

$495,000 (reflecting the credit for the $5,000 already paid by Lockheed pursuant to stipulation 2), plus prejudgment interest totalling $102,358.77 and costs of $189,840.45.

The same jury decided the next case, *Zimmerly v. Lockheed Aircraft Corporation.* Zimmerly claimed damages for a condition called hydrocephalus as well as for MBD. One day before the case was scheduled to go to the jury, the parties settled the hydrocephalus claim, leaving only the MBD claim for the jury's decision. The jury held in favor of Lockheed, finding by special verdict that Lockheed neither caused nor aggravated any injury to Zimmerly.

In the third trial, *Marchetti v. Lockheed Aircraft Corp.*, a jury comprised of four original jurors plus two original alternates found by special verdict that the crash had caused MBD in the plaintiff, and awarded plaintiff $1,000,000 in compensatory damages. The District Court entered judgment against Lockheed for $995,000, plus prejudgment interest in the amount of $222,-711.73 and costs (including amicus and guardian fees) of $195,600.40.

After the verdict in *Marchetti*, Lockheed moved for new trials in *Schneider* and *Marchetti.* Plaintiff moved for a new trial in *Zimmerly.* On July 15, 1980, the District Court granted plaintiff Zimmerly's motion for a new trial.

Before *Zimmerly II* could get underway, however, the District Court, on motion of another plaintiff in a related case, entered a Comprehensive Pretrial Order that collaterally estopped Lockheed to relitigate in any subsequent case the question whether the circumstances of the accident were sufficient to cause injury in the infant plaintiffs.[3] In practical terms, this Order precluded Lockheed from offering any evidence relating to the circumstances of the crash. Lockheed was restricted to arguing either that plaintiff's injury predated or postdated the crash, or that plaintiff was not injured at all.

---

**3.** Plaintiff James Reynolds' case was originally scheduled as the fourth case to go to trial. Before *Zimmerly II,* Reynolds moved for a ruling *in limine* that would collaterally estop Lockheed to relitigate the question whether the

circumstances of the crash were sufficient to cause injury. On Aug. 21, 1980, the court granted the motion, which became the basis of the Comprehensive Pretrial Order of Oct. 30, 1980.

*Zimmerly II* was tried in accordance with this pretrial order. The jury returned a general verdict for plaintiff Zimmerly in the amount of $400,000, which was later reduced to $395,000 by the judge and then augmented with a prejudgment interest award of approximately $120,192.05 plus guardian *ad litem* and amicus fees of $404,-814.21.

Lockheed appealed all three cases, seeking as well the reinstatement of the jury's favorable verdict in *Zimmerly I.* Plaintiffs cross-appealed as to several of the District Court's rulings. We consolidated and expedited these cases for oral argument and decision.

## II

Lockheed has urged reversal and retrial of these cases on numerous grounds including, *inter alia*, erroneous and prejudicial evidentiary admissions, discovery rulings, and jury instructions. Appellate courts are always reluctant to disturb jury verdicts, especially in complex and time-consuming cases, and will do so only when prejudicial error has clearly occurred. Regretfully, we conclude that such was the case in all three of these trials. In our view, the admission of Exhibit 109 was prejudicial error requiring the reversal of *Schneider* and *Marchetti*, and undercutting the collateral estoppel ruling that was the predicate of *Zimmerly II.*

### A. Admissibility of Exhibit 109

The plaintiffs in *Schneider, Marchetti,* and *Zimmerly I* introduced Exhibit 109 as an evidentiary admission by Lockheed to show that the infants were probably injured when the door left the airplane. The exhibit consisted of four pages from the transcript of a hearing held before the trial judge on January 6, 1978. The fourth page of Exhibit 109 contained the following statement by Lockheed counsel: "We also submit that these infants, without oxygen at 23,000 feet, probably sustained some injury at the time that this door left the aircraft." Exhibits, 64; *In re: Air Crash Disaster Near Saigon, South Vietnam,* 476 F.Supp. 521 (D.D.C.1979) (Tr. of Jan. 6,

1978: 142). From the procedural context and a reading of the full hearing transcript, we conclude that the above statement was inadmissible.

### 1. Procedural Context

Shortly after the initial complaint was filed on April 2, 1976, Lockheed filed a third-party complaint against the United States for indemnity and contribution "[i]f defendant and third-party plaintiff Lockheed is held liable for all or any part of the claims asserted against it" by the original plaintiffs. *See* Amended Third-Party Complaint, *Schneider v. Lockheed v. United States,* C.A. No. 76–0544–1 (D.D.C.). Lockheed contended that if any injury to plaintiffs occurred as a result of the accident, such injury took place over international waters as well as in Vietnam, thus rendering the injury a maritime tort for which the United States could be liable under the Suits in Admiralty Act, 46 U.S.C. § 741 *et seq.* (Supp.III 1979). Amended Third-Party Complaint. The United States moved to dismiss the complaint, arguing, *inter alia*, that the injury, if any, occurred in Vietnam, and the third-party claim was thus barred by 28 U.S.C. § 2680(k) (Supp.III 1979), which excepts claims arising in a foreign country from the scope of the Federal Tort Claims Act, 28 U.S.C. § 2671 *et seq.* Motion of Third-Party Defendant United States of America to Dismiss.

Lockheed, in its Opposition to the Motion to Dismiss, noted that the issue before the court was a "jurisdictional bar under the Federal Tort Claims Act" and reiterated its claim that the United States was liable for a maritime tort. Moreover, in alleging injury to plaintiffs caused by the negligence of the United States, Lockheed stated that *"[f]or the purpose of deciding the issues raised in the motions pending before this Court,* the foregoing factual matters [*i. e.,* the allegations of the original complaint] must be *assumed* to be true." Opposition to the Motion to Dismiss. (emphasis added).

Oral argument concerning the above motions was held on January 6, 1978. The procedural context indicates that the rele-

vant issue was whether injury to plaintiffs, if it occurred, took place over international waters, thus subjecting the United States to a tort claim. Injury was assumed *arguendo* for the purpose of determining third-party liability.

2. Transcript of the January 6, 1978 Hearing

 Counsel for Lockheed and the United States made several statements during the hearing which indicate that injury was being assumed solely for the purpose of the third-party motions. At one point, for example, counsel for Lockheed noted the factual assumptions underlying the hearing:

MR. DUBUC: * * *

One of the major issues, of course, remaining is this issue of indemnity. And I think we might take up the question of the Foreign Act or Foreign Country Exclusion which applies to all of the cases first.

And, in connection with that, I would like to focus a little on the facts of the case. Now, these facts are derived from the two reports prepared and published by the United States Air Force. So, *for the purposes of this* [third-party] *motion, I assume that we can take them as accurate as far as the Air Force is concerned. For the purposes of ultimate liability* [*i. e., between plaintiffs and Lockheed*], *of course, we may all have some differences.*

THE COURT: But you wouldn't suggest that they are admissions?

MR. DUBUC: I am just suggesting, for the purposes of this case, that they would certainly estop the Air Force from taking an opposite position.

Furthermore, since these are motions of the Air Force in the way of judgment on the pleadings, as we have indicated, we assume that what we properly pleaded is taken as accurate *for the purposes of these motions.*

(Tr. 135) (emphasis added).

In short, the facts asserted during the hearing, and the accident reports from which they were derived, were assumed to be correct only for the purpose of arguing the third-party motions. Indeed, it can be seen from the preceding and following excerpts that estoppel and judicial notice refer to the Air Force's assessment as to where the alleged injury took place.

(MR. DUBUC): * * *

Now, the cargo door which left the airplane was found and recovered by salvage operations on the high seas. Counsel has made reference in his argument to the fact that injury occurred in Vietnam. And we submit this set of facts, which is clear from the accident reports prepared by the Air Force ... a large number of the Vietnamese orphans, were on the hangar deck, the cargo deck, strapped to the cargo deck, without oxygen and without seats. And we know from the report that at least one or two Air Force crew members departed the airplane because they were near the door at the time it occurred and that at least one or two others were injured on climbing on ladders and that sort of thing. We also submit that these infants, without oxygen at 23,000 feet, probably sustained some injury at the time that this door left the aircraft.

So with respect to the argument on the issue as to whether or not this may or may not be a maritime tort, we think that might also be taken into consideration as a matter of fact, possibly judicial notice.

(Tr. 141–42).

We find that the statement was not an admission of injury by Lockheed.

3. The District Court Ruling

On March 4, 1980 plaintiffs filed a motion for a ruling *in limine* that the January 6, 1978 "admission" be admitted into evidence as a judicial admission. In its opposition to this motion, Lockheed correctly noted that [n]o concession of injury was intended but rather the statement constituted only a suggestion as to where the accident occurred for purposes of deciding conflicts of law questions, if there was indeed any injury at that time. ... [T]he

oft-quoted statement was made approximately one year before counsel for plaintiffs deigned to have any of the children examined, approximately two years before the results of those examinations were furnished to Lockheed, and more than two years before Lockheed was permitted to have these three plaintiffs independently examined. Thus, any comment made by counsel for Lockheed in January 1978 as to the infants' condition was, and could only be, considered an "assuming arguendo" comment. . . . Under no stretch of the imagination can this isolated sentence be considered an admission when all other factors are considered. . . . .

(Opposition Motion).

The court below, in a Final Pretrial Order issued on March 14, 1980, ruled that Exhibit 109 would be admitted as an evidentiary admission. The trial judge stated that the motion for leave to offer Lockheed's "statement on the record of January 6, 1978, that plaintiffs were injured is granted with the provision that the entire context be adduced simultaneously. It would be unfair to require defendant to wait for cross-examination or rebuttal to complete the context." (Order at 4).

Several other Circuits have previously held that statements made by a defendant in reference to a claim against a third party cannot be used as evidence by the plaintiff in the original action. *See, e. g., Douglas Equipment, Inc. v. Mack Trucks, Inc.,* 471 F.2d 222 (7th Cir. 1972); *Continental Insurance Co. v. Sherman,* 439 F.2d 1294 (5th Cir. 1971); *Gadaleta v. N–A Stoomvart,* 291 F.2d 212 (2d Cir. 1961). In *Continental Insurance Co.,* 439 F.2d at 1298, the court explained the rationale for excepting third-party pleadings from the general rule of admissibility:

Strictly applied . . . [the general] rule would place a litigant at his peril in [that] . . . the allegations in third-party complaints and cross-claims seeking recovery over in the event of liability in the principal action could be used in that action as admissions establishing liability. Thus, as a necessary exception to the general rule, there is ample authority that one of two inconsistent pleas cannot be used as evidence in the trial of the other.

We conclude that it was error for the trial judge to admit Exhibit 109 into evidence. The goals of efficient federal procedure would be frustrated if hypothetical pleadings from third-party proceedings could be introduced into evidence. Moreover, these purely contingent statements could not affect the probability of correctly determining whether the children were injured when the aircraft door blew off. They are therefore irrelevant.[4]

Once the court ruled that Exhibit 109 was admissible, there was no realistic cure available to Lockheed. The exhibit was repeatedly cited by plaintiffs' counsel during the trials as an "admission" of injury by Lockheed. To establish the statement's irrelevancy, Lockheed's counsel would have needed to explain to the jury the intricacies of third-party liability, alternative pleading, the "foreign country exception" to the Tort Claims Act, and the jurisdictional foundations of the Suits in Admiralty Act. "Such an undertaking would have constituted a significant departure and might well have hopelessly confused the jury." *United States v. Pollock,* 394 F.2d 922, 926 (7th Cir.), *cert. denied,* 393 U.S. 924, 89 S.Ct. 255, 21 L.Ed.2d 260 (1968). Such an explanation would also have been ineffective.

---

**4.** Federal Rule of Evidence 401 reads as follows:

Rule 401. Definition of "Relevant Evidence"

"Relevant evidence" means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.

Federal Rule of Evidence 402 states:

Rule 402. Relevant Evidence Generally Admissible; Irrelevant Evidence Inadmissible.

All relevant evidence is admissible, except as otherwise provided by the Constitution of the United States, by Act of Congress, by these rules, or by other rules prescribed by the Supreme Court pursuant to statutory authority. Evidence which is not relevant is not admissible.

## B. Prejudicial Effect in *Schneider* and *Marchetti*

When an error has been committed in the admission of evidence, such error is not ground for reversal unless it appears from the entire record that the complaining party may have been substantially prejudiced thereby, *i. e.*, that he suffered injury, was denied substantial justice, was prevented from or prejudiced in presenting his case on the merits, or had his substantial rights otherwise adversely affected by the error. *See Kotteakos v. United States*, 328 U.S. 750, 764–65, 66 S.Ct. 1239, 1247–48, 90 L.Ed. 1557 (1946); *Palmer v. Hoffman*, 318 U.S. 109, 116, 63 S.Ct. 477, 481, 87 L.Ed. 645 (1942). As the Court stated in *Kotteakos*:

> The inquiry cannot be merely whether there was enough to support the result, apart from the phase affected by the error. It is rather, even so, whether the error itself had substantial influence. If so, or if one is left in grave doubt, the [judgment] cannot stand.

328 U.S. at 765, 66 S.Ct. at 1248. In view of the nature of Exhibit 109 and the use to which it was put, we find that substantial rights were affected by the error. Therefore, we reverse the judgments and order new trials in *Schneider* and *Marchetti*.

### 1. *Schneider*

The issues in the *Schneider* case were whether Michael Schneider suffered injury as a proximate cause of the accident and what compensation, if any, was warranted.

Schneider was an infant at the time of the accident; conflicting testimony placed him between ten and nineteen months old. Br. of Lockheed; A. 14–15. The plaintiff had spent most of his life in Vietnamese orphanages, where poor conditions may have caused physical and mental problems independent of the accident. Plaintiff's experts testified that the hypoxia, decompression, and impact trauma associated with the

accident were sufficient to cause MBD [5] in the infants, while Lockheed experts testified that the conditions were insufficient to cause MBD. Plaintiff's experts also stated that Schneider was healthy prior to the accident, that he now has MBD and epilepsy which were caused by the tragedy, and that he will need remedial services and therapy into adulthood. Lockheed's experts countered that Schneider does not have MBD or epilepsy, that any developmental problems he does have are attributable to non-accident related conditions in Vietnam, and that he will not need significant remedial treatment in the future. Br. of Lockheed, at 11; A. 14–24.

After four days of deliberations, the jury returned a verdict for the plaintiff. The jury found by special verdict that the circumstances of the accident had not caused any new injury to Schneider but that they had aggravated a pre-existing injury. The enumerated causes of the aggravation found by the special verdict were "Explosive Decompression", "Hypoxia", "Impact", "Psychological Trauma", and "A Combination of the Above Factors". (*Schneider* J.A. at 364–65). The jury awarded $500,000 in compensatory damages divided into $100,000 increments for each of five categories: physical injury, past and future medical expenses, future educational expenses, pain and suffering, and lost future earnings. (*Schneider* J.A. at 365).

Plaintiff's counsel mischaracterized Exhibit 109 during the trial and employed it in an attempt to discredit Lockheed's lawyer. The counsel introduced the exhibit by saying, "Next I want to read an admission, if it please the Court, Exhibit 109 . . . ." (Tr. 1242.). During cross-examination of a Lockheed aerospace medical expert who had testified that the accident could not have caused hypoxia, plaintiff's counsel inquired, "Now, were you aware that Lockheed had admitted that these babies had sustained an injury at the time of the explosive decom-

---

**5.** MBD is a generic term employed to describe hyperactivity, chronic inattention, and other personality disorders. MBD can be caused by many conditions, such as malnutrition, hypo-xia, dehydration, deprived family background, etc., and it is especially prevalent in adopted infants.

pression?" (Tr. 2631). In his closing argument, plaintiff's counsel first stated that Lockheed's lawyer had "made mention in open court, while an argument was being made as to where the children were injured, that the children sustained some injuries at the time of the explosive decompression over the ocean." (Tr. 3750). This statement implied that the fact of injury had been conceded rather than assumed for the purposes of the third-party hearing. In rebuttal closing argument, plaintiff's counsel said to the jury:

> Did you hear Mr. Dubuc [Lockheed's counsel] explain why he told the judge that the children were injured over the ocean in the air when it was important for Lockheed to have that happen?
>
> * * * * * *
>
> Did you hear a single word about that? Any explanation at all?
>
> * * * * * *
>
> And I ask you to keep in mind whether it isn't now Lockheed's convenience to argue something else and tomorrow something different? They have a capacity to do so. . . .

(Tr. 3814–15).

By admitting Lockheed's statement that "these infants, without oxygen at 23,000 feet, probably sustained some injury at the time this door left the aircraft," the trial judge permitted the plaintiffs to (i) represent that Lockheed had earlier conceded the very fact which it was denying at trial and (ii) argue that Lockheed and its counsel were dishonest.

As noted above, the jury found that Schneider had suffered some pre-existing injury, but that the injury had been aggravated by both the decompression/hypoxia and the impact. Thus, the jury did not completely discredit Lockheed's testimony concerning pre-existing injury. It is impossible, however, to ascertain what role each of the evidentiary elements played in the jury's determination of the verdict. Exhibit 109 may have (1) convinced the jury that the effects of the impact were exacerbated by hypoxia; (2) influenced jurors to compromise in the overall verdict; (3) been treated by jurors as a conclusive admission on the critical question of injury; and (4) discredited much of Lockheed's case in the minds of the jury.

The attempts by plaintiff's counsel to employ Exhibit 109 in a manner prejudicial to Lockheed are obvious from the record. As the Court stated in *Kotteakos*,

> [i]f one cannot say, with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not swayed by the error, it is impossible to conclude that substantial rights were not affected.

328 U.S. at 765, 66 S.Ct. at 1248.

Because there can be no assurance that substantial rights were not affected by the alleged "admission" and the allegations of dissembling, we reverse and order a new trial in *Schneider*.

### 2. *Marchetti*

In the *Marchetti* case, the issues were again whether the plaintiff had suffered injury as a proximate cause of the accident and what compensation, if any, was required.

Melissa Marchetti was approximately thirteen months old at the time of the accident; like Schneider, she had spent her life in a Vietnamese orphanage. Marchetti had a history of illness prior to the accident, and at trial both sides agreed that she has MBD and is hyperactive. Br. of Lockheed, at 5–13. Lockheed's experts testified that Marchetti's problems are attributable to pre-accident factors, while plaintiff's experts stated that her condition was caused by the accident. Lockheed experts also asserted that Marchetti would need minimal remedial treatment in the future; plaintiff's experts testified that she would require substantial remedial therapy well into adulthood. *Id.*

After deliberating for ten hours, the jury found by special verdict that the circumstances of the accident directly caused injury to Marchetti. As in *Schneider*, the spe-

cial verdict enumerated "Explosive Decompression", "Hypoxia", "Impact", "Psychological Trauma", and "A Combination of the Above Factors" as causes of injury. (*Marchetti* J.A. at 163–64). The jury awarded Marchetti $1,000,000 in compensatory damages which were allocated as follows: $416,000 for past and future medical expenses; $225,000 for future educational expenses; $139,000 for permanent injury; $116,000 for pain and suffering; and $104,000 for lost future earnings. (*Marchetti* J.A. at 164).

Exhibit 109 was mischaracterized and used to discredit Lockheed more extensively in *Marchetti* than in *Schneider*. Two of plaintiff's experts (Drs. Feldman and Malone) relied on the "admission" in concluding that the accident caused MBD in the plaintiff. Dr. Feldman was asked by plaintiff's counsel "to assume that the Lockheed Corporation admitted in a legal argument that, at the time of the explosive decompression, that the children on that airplane sustained some injury." (Tr. 221). Dr. Malone was asked by the counsel "to assume the Lockheed Corporation admitted, as a fact, in the course of a legal argument before the Judge that at the time of the explosive decompression, that Lockheed submitted, that the children in the airplane sustained some injury." (Tr. 36–37). Dr. Malone stated that based on "the assumptions you have just asked me to hold," he believed that Marchetti's MBD was due in part to hypoxia. (Tr. 40–41). Moreover, plaintiff's counsel furnished its experts with a copy of the "admission" before trial, and Dr. Feldman referred to this "admission by Lockheed" four times during his testimony. (Tr. 78, 82–83). At one point, for example, Dr. Feldman stated that

> I am not an expert in aerospace medicine, but when Lockheed—and I am sure Lockheed knows something about aerospace—states that infants can be injured when the door blows off, that makes some sense to me . . . . I felt that the impact was more significant than the hypoxia.

But it appears that Lockheed may feel that the hypoxia played a role.

(Tr. 78).

Because there was conflicting evidence at trial with respect to the effect of hypoxia, the above expert testimony based upon the mischaracterized "admission" was highly prejudicial.

Plaintiff's counsel also stated that Lockheed, its counsel, and its expert witnesses were lying because they refused to concede the injury previously "admitted" by Lockheed in Exhibit 109. Counsel said that "Lockheed wants us to believe the impossible. . . . This was a terrible accident and anybody that says it isn't is a liar" (*Marchetti* J.A. at 107). The counsel declared that he had presented his own witnesses "to tell you the truth" (*Marchetti* J.A. at 115) and accused Lockheed of telling

> a gross lie. And the worst thing about it is that it's a lie about a little child, who got on that airplane—was put on there, and it's a disgrace. It is an absolute disgrace that they would come in and say such a thing.

(*Marchetti* J.A. at 118).

In his closing argument, plaintiff's counsel referred to Exhibit 109 several times. Counsel stated:

> Why would Lockheed say, why would Lockheed tell the Court in an admission that they submit that these children sustained an injury when the door blew off, that it wasn't true? If they were trying to persuade the Court of a legal argument at that time, and it wasn't true, why should we believe what they say now?

(Tr. 178–79).

In rebuttal summation, the counsel said:

> Members of the jury, I would just like to recall to your mind that Mr. Dubuc, throughout this trial, never once explained the admission—let me read you the conclusion of it. "We also submit that these infants, without oxygen at 23,000 feet, probably sustained some injury at the time this door left the aircraft."

Why didn't he ever explain that to you? All sorts of scientific proof—Lockheed is a big aerospace company. That's what he told the Judge, and he tells you something different now. Why didn't he explain that * * * ?

(Tr. 217–18).

The improper and prejudicial use of Exhibit 109 to influence expert testimony as well as to contradict and discredit Lockheed was exacerbated by a portion of the jury instructions which may have led the jurors to treat the exhibit as a conclusive admission. The trial judge stated to the jury:

A statement or argument of counsel is not evidence, and should not be considered as evidence, unless the statement is made as an admission or as part of a stipulation. In this case, you are instructed that the defendant, Lockheed Aircraft Corporation, does not contest its liability to compensate the plaintiff, Melissa Marchetti, for any compensatory damages which she sustained as a result of being on board the C5A aircraft on April 4, 1975, and that Lockheed admits that the plaintiff, Melissa Marchetti, was on board the C5A on April 4, 1975. *You should treat Lockheed's admissions and concessions as being true.*

(*Marchetti* J.A. at 134) (emphasis added).

Although the above instruction was proper, it may have influenced the jury to treat Exhibit 109 as an absolute concession of injury since the exhibit was mischaracterized throughout the trial as an "admission" by plaintiff's counsel and witnesses.

Several other aspects of the *Marchetti* trial have been cited by Lockheed as independent grounds for reversal: counsel's inflammatory summation, the District Court's erroneous instructions with respect to causation, and the size of the jury verdict. While we feel that these matters do not in themselves justify reversal, they did, in conjunction with the erroneous admission of Exhibit 109, irreparably taint the trial and strengthen Lockheed's case for reversal.

Because these circumstances may recur on retrial, we discuss them briefly below.

Throughout his summation, counsel for plaintiff engaged in inflammatory remarks regarding Marchetti's injury which had little or no basis in the record. For example, counsel stated that even with remedial treatment, "[s]he's going to be the girl that everybody calls weird, strange" (*Marchetti* J.A. at 111), said that "Lockheed has damaged this child in a way that money cannot repair", and asserted that Marchetti could not be helped even "[i]f you piled the money as high as the courthouse" (*Marchetti* J.A. at 112). Counsel exhorted the jury to contrast "a big aerospace company" with "a baby, a very fragile thing" (*Marchetti* J.A. at 117). In an appeal to the jury's conscience, the counsel pleaded "You've got to help us with the money .... [I]f you make a mistake, members of the Jury, there's no way you can correct it. You are going to have to live with it." (*Marchetti* J.A. at 112). These remarks invited the jurors to decide the issues of causation and damages based upon sympathy for an infant plaintiff and prejudice against a corporate defendant; the summation also alleged "facts" that were not properly in evidence.

■ An erroneous instruction invited the jury to reject Lockheed's defense. The judge stated in *Marchetti*:

It is of no consequence that someone or some factor other than the defendant Lockheed may also have been at fault, may have been at fault in some manner or may have caused or contributed in some way to plaintiff's injury resulting from the accident.

(*Marchetti* J.A. at 146).

The trial judge was attempting to instruct the jury to disregard the possibility that the United States was also at fault. The formulation of the charge is so misleading, however, that it might reasonably have led a juror to conclude that Lockheed's primary defense—pre-existing injury—was no legal defense at all. The jury instructions quoted above are erroneous and must be excluded

or substantially clarified in any future trial.[6]

The verdict reached by the jury is also evidence of the effects of the prejudicial Exhibit 109, summation, and jury instructions. In determining whether a damage award is excessive, courts generally inquire whether the verdict is supported by the evidence adduced at trial. *Frank v. Atlantic Greyhound Corp.*, 172 F.Supp. 190, 191 (D.D.C.1959); *Washington v. National Railroad Passenger Corp.*, 477 F.Supp. 1134, 1135 (D.D.C.1979). The $1,000,000 award is not justified by the evidentiary record. The $641,000 award for medical and educational expenses, for example, is more than three times the highest figure suggested by *plaintiff's* experts as being necessary. Tr. at 238–39, 236–37. It is highly likely, therefore, that the jury was influenced by factors other than a reasoned examination of the evidence in reaching this verdict.[7]

 In summary, the use of Exhibit 109 in *Marchetti* was so unfairly prejudicial that the admission of the exhibit alone warrants reversal and a new trial. Also, because these issues may recur on retrial, we observe that an inflammatory summation by plaintiff's counsel and erroneous jury instructions may have contributed to an excessive verdict.[8]

---

6. The judge gave a similarly erroneous jury instruction in *Schneider*:

> It is of no consequence in the circumstances that someone or some other factor than the defendant Lockheed may have also been at fault in some manner or may have caused or contributed in some way to plaintiff's injury resulting from the accident.

(*Schneider* J.A. at 347).

As noted above, the judge's formulation of this instruction is erroneous, but it does not alone warrant new trials. The Supreme Court stated in *Seaboard Air Line Ry. v. Padgett*, 236 U.S. 668, 672, 35 S.Ct. 481, 482, 59 L.Ed. 777 (1915) that "[w]hether the instructions could have produced misconception in the mind of the jury is not to be ascertained by merely considering isolated statements but by taking into view all the instructions given and the tendencies of the proof in the case to which they could possibly be applied." The Court noted that even where instructions were contradictory, a charge which is otherwise explicit in explaining the law correctly can dispel the possibility of misconception." *Id.* In both *Schneider* and *Marchetti*, the trial judge repeatedly stressed in his instructions to the jury that it was to reach a verdict against Lockheed only if it found that the plaintiff had sustained injuries as a proximate result of the C5A accident. *See, e. g., Schneider* J.A. at 336, 342–43, 345–46; *Marchetti* J.A. at 124, 141–42, 145. It is uncertain from the entire charge that the jury was led astray.

7. On the other hand, Lockheed concedes that the $500,000 award in *Schneider* "did not exceed the plaintiff's evidence." Br. of Lockheed at 62.

8. Lockheed also asserts that plaintiffs' alleged violations of pretrial discovery rules and orders in the *Schneider* and *Marchetti* cases deprived the defendant of a fair trial. Br. of Lockheed: (*Schneider* at 34–62); (*Marchetti* at 26–32). The alleged violations are: (i) plaintiff's failure to disclose the existence of a third normal electroencephalographic (EEG) test regarding Schneider during trial; (ii) plaintiff's failure timely to identify an expert witness in *Schneider*; and (iii) plaintiffs' failure to produce portions of the data underlying medical summaries regarding 34 orphans which were introduced into evidence in both trials. These alleged violations do not constitute grounds for new trials.

Although the Schneider EEG was not disclosed until the *Zimmerly I* trial, two normal EEG's were already in evidence and a third EEG would have been cumulative. While plaintiff's failure timely to disclose the third EEG is inconsistent with the spirit of the Federal Rules of Civil Procedure, the trial judge was within his discretion in concluding that the failure to produce the EEG did not deprive the defendant of a fair trial.

With regard to the alleged failure of plaintiff timely to identify the expert witness, Dr. Busby, in *Schneider*, we observe that Lockheed was notified more than forty days prior to the actual expert witness testimony that Dr. Busby would testify at trial. Br. of Schneider at 98–86. It cannot be said that the addition of Dr. Busby to the expert witness list three weeks before the commencement of the trial so unfairly prejudiced Lockheed as to be grounds for a new trial. As this court observed in *Washington Hospital Center v. Cheeks*, 129 U.S.App. D.C. 339, 341, 394 F.2d 964, 966 (1968), "we must assume Appellant's counsel was prepared to cross-examine all opposing expert medical witnesses on the expectation that they would testify consistent with the theory of Appellee's case."

Finally, plaintiffs' production of data regarding only 14 of the 34 orphans whose medical condition was summarized in trial exhibits did not so unfairly prejudice Lockheed as to require a new trial. Lockheed had been invited to join in the examinations of the children and had refused. The defendant had conducted

## C. *Zimmerly I*

In *Zimmerly I*, the District Court set aside a jury verdict in favor of Lockheed and ordered a new trial pursuant to Fed.R. Civ.P. 59(b). The court found that the jury had been confused by two matters: first, an ambiguity in testimony with respect to peak versus average gravity forces ("G-forces") caused by the plane's impact; second, the last-minute settlement and withdrawal of plaintiff's claim for damages due to hydrocephalus. We uphold the court's action as falling within its discretion.

A trial court has wide discretion in setting aside a jury verdict where, as here, the motion granted is for a new trial, not judgment n. o. v.;[9] the court's decision concerns matters of fact, not law;[10] and the new trial is ordered because confusing testimony and events created a potential for injustice, not because the jury's verdict is against the weight of the evidence.[11] We have found no case in which a trial court has been reversed in these circumstances. Only the grossest abuse of discretion could justify reinstating the jury's verdict.

The parties contest responsibility for any confusion.[12] That controversy is beside the point, for the trial court's decision did not depend on a finding of fault. The only issue before us is whether the jury might have been confused. Like demeanor, confusion is more readily discerned by one in a position to observe the trial. Our failure to find confusion would not be dispositive.

*See, e. g., Community National Life Insurance Co. v. Parker Square Saving and Loan Association*, 406 F.2d 603, 605 (10th Cir. 1969). Moreover, we find no basis for concluding that the jury was *not* confused.

The possibility of confusion must be considered in the context of this trial's novel procedure. Although evidence on G-forces was largely incorporated from the earlier *Schneider* trial, the witnesses' assumptions were in some instances unclear until the later *Marchetti* trial. At least one witness (Gibbons, *Schneider*, Tr. 2608) was asked to assume that the *peak* force of the crash was 1.6 G. Another witness (Quinn, *Zimmerly I*, Tr. 836) was asked to assume 1.4 G without qualification as to peak or average. A third witness (Wender, *Marchetti*, Tr. 97–99) was not asked to make an assumption about G-forces, but nevertheless inferred that the figures previously mentioned had represented peak forces. Lockheed asserts that both the trial judge and Dr. Wender were confused about the forces assumed in the hypothetical questions. Br. of Lockheed at 23 n.26. If the judge was confused, we have no difficulty believing that the jury was also confused.

Withdrawal of the hydrocephalus claim might also have caused confusion. Most of plaintiff's medical evidence involved hydrocephalus, either alone or in conjunction with MBD. The symptoms of the two conditions overlap, and the jury might well have been unable to evaluate evidence specifically relating to MBD, despite an instruction to do

depositions of plaintiff's medical experts and was informed therein that the doctors had found injury in all of the examined infants. In addition, Lockheed was given full opportunity during cross-examination to pursue its theory that the accident had not caused the alleged injuries. Br. of Schneider at 65–78; Br. of Marchetti at 34–38. Although the defendant was entitled to all of the data, we do not find that the trial judge's failure to order new trials because of the admission of the summaries was an abuse of discretion.

9. *See Luck v. Baltimore and Ohio R.R.*, 510 F.2d 663, 668 (D.C.Cir.1974); *Haber v. County of Nassau*, 557 F.2d 322, 325 (2d Cir. 1977); *Nodak Oil Co. v. Mobil Oil Corp.*, 533 F.2d 401, 410 (8th Cir. 1976).

10. *See, e. g., Fairmont Glass Works v. Cub Fork Coal Co.*, 287 U.S. 474, 481, 53 S.Ct. 252, 254, 77 L.Ed. 439 (1933).

11. *See Reed Brothers, Inc. v. Monsanto Co.*, 525 F.2d 486, 499–500 (8th Cir. 1975), *cert. denied*, 423 U.S. 1055, 96 S.Ct. 787, 46 L.Ed.2d 645 (1976); *Wood v. Holiday Inns, Inc.*, 508 F.2d 167, 175–77 (5th Cir. 1975); *Lind v. Schenley Indus., Inc.*, 278 F.2d 79, 88–91 (3d Cir. 1960).

12. Appellant, for example, argues (Br. at 28) that its hypothetical questions to its experts were not improper. Appellee (Br. at 18) implies that the trial judge improperly forced a settlement of the hydrocephalus issue.

so. The task was made more difficult because general information about MBD was incorporated from the *Schneider* trial, whereas information about hydrocephalus was based on live testimony.

■ We therefore discern no grounds for rejecting the trial court's finding of jury confusion. Misunderstanding the central factual issues—the force of the landing and the medical symptoms—could have led to an unjust verdict for Lockheed. We note that the second *Zimmerly* trial resulted in a jury verdict for the plaintiff.[13] Such an inconsistency between two flawed trials does not show that either was unfair, but it does counsel caution in attempting to choose between them. In view of our narrow scope of review, any doubt should be resolved in favor of the new trial.

## D. *Zimmerly II*

The second Zimmerly trial (*Zimmerly II*) was governed by the Comprehensive Pretrial Order ["CPTO"] of Oct. 30, 1980. *Zimmerly* J.A. at 236. The CPTO incorporated the court's collateral estoppel order of Aug. 21,[14] which, based on the judgments in *Schneider* and *Marchetti*, prevented Lockheed from denying that the accident could have caused plaintiff's injuries. The CPTO further restricted the parties with regard to certain matters of proof.[15] The jury re-

---

13. In *Zimmerly II*, the jury necessarily found that plaintiff *does* suffer from MBD—a conclusion unaffected by the erroneous collateral estoppel ruling which causes us to set aside that verdict. This finding directly contradicts Lockheed's view of the evidence in *Zimmerly I*. Lockheed asserts that the G-force assumptions of its medical witnesses were unimportant in *Zimmerly I* because these doctors had examined James Zimmerly and found no MBD. Br. at 24.

14. *Friends for All Children, Inc. v. Lockheed Aircraft Corp.*, 497 F.Supp. 313, 319 (D.D.C. 1980).

15. The collateral estoppel ruling provided that: Neither Lockheed nor the Third-Party Defendant shall attempt to relitigate, reoffer evidence, or reargue, in the presence of the jury, whether there was insufficient hypoxia, force, psychological trauma, or explosive decompression in the troop compartment of the C5A as to proximately cause neurological dysfunction (MBD) or proximately aggravate preexisting injury, disease, defect, or disability.
*Friends for All Children v. Lockheed Aircraft Corp.*, 497 F.Supp. 313, 319 (D.D.C.1980).
The Comprehensive Pretrial Order provided the following "scenario," which organized and limited the proof at trial as follows:
1. The jury would be read a stipulation of facts that will explain the circumstances of the C5–A crash. The parties may add to this statement pertinent detail, such as a verbal description of the manner in which plaintiffs were seated in the troop compartment, that is relevant to the nature or degree of injuries that plaintiffs may now suffer, including a photograph of a number of children strapped two to a seat.
2. The trial court would supplement these statements with a preliminary instruction that (a) the Defendant Lockheed has agreed

not to contest its liability for injuries resulting from the crash; and (b) the crash and the forces associated with it were sufficient to cause any brain injury, such as MBD, that plaintiff demonstrates that he now suffers.
3. Plaintiff's case in chief would be limited to evidence showing (a) that plaintiff now suffers or has suffered from mental defect, brain injury or other physiological injury; and (b) the amount needed to compensate plaintiff for the effects of such injury. Such evidence could be limited to such testimony as the reports of expert medical witnesses who examined plaintiff or medical records, school teachers, and expert economic or other testimony showing the amount required to compensate for or treat such disability. Evidence relating to the circumstances of the crash, including graphic testimony and visual descriptions of the crash and its aftermath, would be excluded.
4. Defendants, in their case in chief, could respond with evidence either that (a) plaintiff does not suffer from any injury, or that such injury does not require the compensation demanded by plaintiffs; and/or (b) some or all of plaintiff's present medical condition is the result of causes other than the crash.
5. If the defendant elected to attempt to prove that plaintiff's injuries were the result of an alternative cause, it could not introduce evidence tending to show that the crash was not sufficient to cause the injuries alleged, or adduce expert testimony based on that premise.
6. Additionally, if defendant elected to prove the existence of an alternative cause, plaintiff could, in rebuttal, introduce evidence —documentary, oral, or demonstrative—to prove that the forces associated with the crash were sufficiently severe that the crash was, more likely than not, the sole or substantial cause of plaintiff's injuries. This re-

turned a verdict for the plaintiff. We find the application of collateral estoppel to be improper in the circumstances of this case. Accordingly, we remand for a new trial.

Our disposition of *Schneider* and *Marchetti* removes all basis for the CPTO as applied to *Zimmerly II* and subsequent trials.[16] The CPTO has been challenged on a variety of other grounds, however. The potential future use of collateral estoppel in the remaining cases requires that we address these arguments in the interest of sound judicial administration.

Lockheed first challenges the authority of the District Court, pursuant to the doctrine of *Erie v. Tompkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938), to impose collateral estoppel in the absence of mutuality between the parties.[17] Lockheed notes that the District of Columbia Court of Appeals has not abandoned the requirement of mutuality when collateral estoppel is used offensively—*i. e.*, by a plaintiff. We are directed to a footnote in *Gatewood v. Fiat*, 617 F.2d 820, 826 n.11 (D.C.Cir.1980), in which we stated that the mutuality requirement should not be abandoned by a district court sitting in diversity until the local court has first taken that step. But *Gate-*

*wood* was decided before *Jackson v. District of Columbia*, 412 A.2d 948 (D.C.1980), in which the District of Columbia Court of Appeals did permit the nonmutual application of collateral estoppel. Although the court in *Jackson* was obliged to rule only on a defensive estoppel, it approved in general terms the trend toward abandoning mutuality. It strongly intimated that it is prepared to follow the modern trend if the issue arises.[18] Commentators have noted that there is no difference in principle between offensive and defensive collateral estoppel.[19] We are therefore unwilling to say that courts in this Circuit may not dispense with the mutuality requirement in a proper case. *Cf. Carr v. District of Columbia*, 646 F.2d 599 at 605 (D.C.Cir.1980).

Our statement in *Gatewood* does suggest that a district court should take special care in assuring that a case is appropriate for making this doctrinal change. An air crash case would seem to be a classic candidate for offensive and nonmutual collateral estoppel: *e. g.*, once it is established through adjudication that the defendant's negligence caused an accident, there are sound reasons for preventing him from relitigating that issue in subsequent cases.[20] But

buttal evidence would be limited to items received in the trials heretofore concluded, unless otherwise ordered by transferee Court.

 7. Defendant should elect, at the time of the final pretrial conference before transfer, whether it will attempt to prove the existence of an alternative cause of plaintiff's injuries. This election which would not take place until completion of all discovery, should permit plaintiff to secure, if necessary, the presence of rebuttal lay witnesses who would otherwise not be required. *See* Memorandum of August 21, 1980, pp. 9ff. (Exhibit 1–T) and Order of September 18, 1980, as amended (Exhibits 1–U and 1–U–1).

*Zimmerly* J.A. at 274–76.

**16.** Absent a valid judgment, collateral estoppel will not lie. *See, e. g., Montana v. United States*, 440 U.S. 147, 152, 99 S.Ct. 970, 972, 59 L.Ed.2d 210 (1980).

**17.** In this Circuit, a federal court sitting in diversity must look to local law to determine whether collateral estoppel may be employed, *see Gatewood v. Fiat*, 617 F.2d 820, 826 n.11 (D.C.Cir.1980).

**18.** The District of Columbia Court of Appeals cited with approval the leading authorities which have abandoned the mutuality doctrine in the context of offensive as well as defensive collateral estoppel, *e. g., Parklane Hosiery Co. v. Shore*, 439 U.S. 322, 99 S.Ct. 645, 58 L.Ed.2d 552 (1979); *Bernhard v. Bank of America*, 19 Cal.2d 807, 122 P.2d 892 (1942); Restatement (Second) of Judgments § 88 (Tent. Draft No. 3, 1976). 412 A.2d at 952 n.9.

**19.** *See, e. g.*, Reporter's Note, Restatement (Second) of Judgments § 88 at p. 170 (Tent. Draft No. 3, 1976). *Cf. Parklane Hosiery Co. v. Shore*, 439 U.S. 322, 99 S.Ct. 645, 58 L.Ed.2d 552 (1979).

**20.** *See United States v. United Air Lines, Inc.*, 216 F.Supp. 709, 725–29 (E.D.Wash., D.Nev. 1962), *aff'd in part sub nom. United Air Lines, Inc. v. Wiener*, 335 F.2d 379, 404–05 (9th Cir.), *cert. dismissed*, 379 U.S. 951, 85 S.Ct. 452, 13 L.Ed.2d 549 (1964). Multiple claimant cases are also said to present a particular danger of unfairness in the use of nonmutual collateral estoppel, *see* Currie, *Mutuality of Collateral Estoppel: Limits of the* Bernhard *Doctrine*, 9

the subject of estoppel here is far different from the question of whether a course of conduct caused a single event. Here the question is whether an accident caused particular injuries to 150 separate persons. We find that each case raises a distinct factual issue.

■■■■ The very heart of the collateral estoppel doctrine is the requirement that the issue to be precluded must be substantially the same as the issue previously litigated. *Montana v. United States*, 440 U.S. 147, 153, 99 S.Ct. 970, 973, 59 L.Ed.2d 210 (1980). Delineating the proper scope of the estopped issue is often a difficult and delicate task. The court must weigh the burden of repetitious litigation against the risk of denying a party his day in court.[21] Many of the criteria we look to in determining "substantial identity of issues" have been met here:[22] evidence of the accident is the same for each case; the claims are closely related; the arguments and issues of law are virtually identical. But the cases are also different in one important respect: they involve different individuals, each with his own physical constitution and developmental history, and each alleging a particular set of symptoms caused by the accident.

To find causation, a jury must assess the circumstances of the accident as they might generally affect a child of a given age and susceptibility, and then relate that information to whatever injuries or problems it finds the specific child to have suffered. It is important to note here that MBD is not a readily identifiable ailment, but a syndrome of highly varied and indefinite symptomology. Although the circumstances of the accident are fixed from case to case,[23] the likelihood that the accident caused each particular set of symptoms could vary. A

finding, for example, that the accident caused anxiety in one child would not show that it could have caused psychomotor seizures in another.

In making its decision, the jury would typically rely on medical evidence in conjunction with information about the accident. Physicians who had examined the child might testify as to the probability that *this* accident caused *this* child to suffer *this* set of symptoms. The fate of other passengers would be probative, but not dispositive. And a reasonable trier of fact could, without contradiction, find for the plaintiff in one case and for the defendant in another.

Here, the collateral estoppel ruling alone did not wholly foreclose the issue of causation. It determined only the issue of whether the circumstances of the accident were *sufficient* "to proximately cause neurological dysfunction (MBD) or proximately aggravate preexisting injury, disease, defect or disability." *Zimmerly* J.A. at 210, 215. By its terms, the estoppel ruling would have prevented Lockheed only from contending that "*no* individual" could have suffered any form of MBD as a result of the accident. Such an estoppel, although proper, would have had limited value in avoiding repetitious litigation. But the CPTO went much further than this narrow estoppel. The crash was deemed sufficient to cause *every* form of MBD in *every* plaintiff.[24]

The CPTO made the defendant responsible for any injury or defect which could not be shown to have another cause. Lockheed was thereby denied its day in court on an issue which was not adjudicated in any previous proceeding: whether the crash could have caused the particular injuries claimed by Zimmerly.

Stan.L.Rev. 281, 289 (1957). *But see* Currie, *Civil Procedure: The Tempest Brews*, 53 Cal.L. Rev. 25, 34–36 (1965).

**21.** *See* Restatement (Second) of Judgments § 68 (Tent. Draft No. 4, 1977).

**22.** *See Carr v. District of Columbia, supra*, at 608 n.47; *Henderson v. Snider Bros., Inc.*, 409 A.2d 1083 (D.C.1978); Restatement (Second) of Judgments § 68 (Tent. Draft No. 4, 1977).

**23.** There was no evidence regarding the location of each individual within the plane.

**24.** *See* note 15 *supra*. In the event Lockheed attempted to prove an alternative cause for a child's MBD, the plaintiff would be permitted to introduce evidence of the crash scene.

In vacating the CPTO here, we do not suggest that appropriate collateral estoppel orders cannot be framed in these or other cases. Nor do we intend otherwise to discourage the district courts or the parties from simplifying the proof offered at trial. We believe, however, that the courts must be wary of the significant differences among these cases before restricting the proof in future trials.

## III

In addition to the above, Lockheed has raised several contentions which, if meritorious, would not require reversal but only adjustment in the amount of costs or interest taxed against Lockheed. Since we conclude above that the judgments in all three cases must be set aside, we are not compelled to reach either party's contentions as to the proper calculation of costs or interest. We are mindful, however, that these same questions will probably arise on a subsequent retrial or appeal of any one of the related cases pending in the District Court. Therefore, we address each of Lockheed's contentions in turn.

### A. Taxation of Amicus and Guardian Fees Against Lockheed

The circumstances surrounding the appointment of the amici and guardians *ad litem* have already been set forth above. The actual duties performed by Mr. Work and his firm in these capacities, however, deserve further comment.

In his capacity as amicus curiae, Mr. Work was primarily responsible for ascertaining whether FFAC should continue to represent the infant plaintiffs or whether the appointment of a guardian *ad litem* would be preferable. After recommending the latter course, Mr. Work and his firm were appointed guardians *ad litem*. During the period preceding the parents' entry into the litigation, the guardians performed a significant service to the court by notifying parents and coordinating litigation efforts. Even after numerous parents had been brought into the litigation, the guardians continued to oversee the litigation, partici-

pate in settlement discussions, and negotiate stipulations. In *Schneider*, the court awarded the guardians *ad litem*/amici total costs of $145,845.31, allocated as follows: amicus fees, $24,848.00; guardian fees, $109,185.00; amicus expenses $429.49; guardian expenses, $11,380.82. *Schneider* record at 181. The subsequent awards in *Marchetti* and *Zimmerly II* were cumulative, representing the prior awards plus additional guardian *ad litem* costs and expenses. In *Marchetti*, the total award was $165,878.34, allocated as follows: amicus fees, $24,848.00; guardian fees, $128,238.50; amicus expenses, $429.49; guardian expenses, $12,362.35. *Marchetti* record at 180. In *Zimmerly II*, the court awarded total costs of $404,814.21, allocated as follows: guardian fees, $367,387.50; guardian expenses, $37,426.71. *Zimmerly II* record at 280. Our task on appeal is to determine whether the District Court's award of fees against Lockheed for services done by Mr. Work and his firm in either of their capacities represented an abuse of discretion.

### 1. Amicus Curiae Fees

The traditional rule regarding compensation of an amicus curiae is that "where the court appoints an amicus curiae who renders services which prove beneficial to a solution of the questions presented, the court may properly award him compensation and direct it to be paid by the party responsible for the situation that prompted the court to make the appointment." 4 Am.Jur.2d, Amicus Curiae § 7 (1969) (citations omitted). *Accord, In re Phi Father Education Assoc.*, 309 S.W. 493 (1957); *In re Mortimer*, 44 Ill.App. 249, 3 Ill.Dec. 92, 358 N.E.2d 92 (1976); *McCoy v. Briegel*, 305 S.W.2d 29, 39 (Mo.App.1957).

Lockheed contends that the Supreme Court's decision in *Alyeska Pipeline Service Co. v. Wilderness Society*, 421 U.S. 240, 95 S.Ct. 1612, 44 L.Ed.2d 141 (1975), altered the traditional rule, but we feel this is a misapplication of the *Alyeska* case. In *Alyeska* the Supreme Court held that federal courts may award attorney's fees only upon specific statutory authorization.

*Alyeska* does not speak to the present case, which involves fees allegedly owed to an expert appointed by the court. "Amicus curiae is technically a 'friend of the court,' as distinguished from an advocate. It arises only via an ex parte order of the Court and fully advises the Court on the law in order that justice may be attained." *Allen v. County School Board of Prince County*, 28 F.R.D. 358, 362 (E.D.Va.1961).

■ Two conditions must be satisfied before amicus fees may properly be assessed against the losing party: first, the court must "appoint[ ] an amicus curiae who renders services which prove beneficial to a solution of the questions presented." 4 Am. Jur.2d, Amicus Curiae § 7. In light of the complexity and unwieldiness of the questions confronting the court at the time the amicus was appointed, we do not doubt that the amicus in this case fulfilled the first portion of this requirement.

■ The second is more problematic: the court may then "direct it [the fee] to be paid by the party responsible for the situation that prompted the court to make the appointment." In this case, the court appointed the amicus initially in response to Lockheed's motion for summary judgment. But it was FFAC's questionable tactic of sending solicitation letters to the infants' parents that prompted Lockheed's motion for summary judgment. Because of these *two* events, the District Court felt compelled to appoint an amicus to advise the court on the resolution of the issues relating to FFAC's capacity to sue.

We cannot conclude, then, that in this case amicus costs were assessed against the proper party. Unless we assume that the party who alerts the court to a potential ethical problem creates that problem, we cannot find that Lockheed created the thorny issues which required the services of Charles Work. Accordingly, we find that any taxation against Lockheed of the amicus curiae fees is contrary to clear legal precedent and inappropriate in these cases.

### 2. Guardian *Ad Litem* Fees

Lockheed contends that the trial court erred as well in including in the costs award the fee of the guardian *ad litem*. Appellant does not question the court's authority in appointing a guardian for the infant plaintiffs, *see* Fed.R.Civ.P. 17(c), or in awarding a fee, *see, e. g., Mutual Life Insur. Co. v. Ginsburg*, 228 F.2d 881 (3d Cir. 1955), *cert. denied*, 351 U.S. 979, 76 S.Ct. 1050, 100 L.Ed. 1495 (1956). Instead, appellant challenges the assignment of the fee as costs, rather than as an award to be paid out of appellees' recovery to the guardians *ad litem*. In any case, Lockheed contends, it cannot be taxed for guardian fees attributable to the period subsequent to the entrance of the parents as next friends of the infant plaintiffs, or for fees incurred for purely "legal activities" such as legal research and LEXIS time.

Appellant recognizes that the award of guardian fees as costs is not without precedent in the federal, *see Franz v. Buder*, 38 F.2d 605 (8th Cir. 1930); *Panitch v. Wisconsin*, 451 F.Supp. 132 (E.D.Wisc.1978), or the local courts, *see Eaton v. Karr*, 251 A.2d 640 (D.C.App.1969). Appellant suggests, however, that such an award was inappropriate here for two reasons. First, the guardian's fee included compensation for legal services. According to appellant, the award therefore violates the rule of *Alyeska Pipeline Serv. Co. v. Wilderness Soc'y*, 421 U.S. 240, 95 S.Ct. 1612, 44 L.Ed.2d 141 (1975), which proscribes awards of attorneys' fees absent specific statutory authority. Second, the guardian's tenure overlapped with the appearance of appellees' adoptive parents. According to appellant, the guardian was thus performing services beyond the contemplation of Fed.R.Civ.P. 17(c), at least as of Dec. 22, 1979.

In our view, appellant construes too narrowly the role of a guardian *ad litem*. Unlike the private attorney in *Alyeska*, a guardian is not simply counsel to one party in the litigation, but instead plays a hybrid role, advising one or more parties as well as the court. 3A Moore's Federal Practice ¶ 17.26 (1978). *See United States v. E. I.*

*Dupont de Nemours & Co.*, 13 F.R.D. 98, 104–05 (N.D.Ill.1952); *Richardson v. Tyson*, 110 Wis. 572, 578, 86 N.W. 250, 251 (1901). The guardian's responsibilities must necessarily differ with each particular case, and the court is therefore accorded wide discretion in shaping his role.

In this case the record suggests that the trial court did not abuse its discretion in compensating the guardian for "legal" expenses or expenses incurred after the parents were brought into the litigation. As appellant recognizes, this litigation presents difficult problems of representation. The case was instituted shortly after the infants were installed in new homes throughout the world. As a result, a significant expenditure of time and funds was necessary before the parents could be located and a manageable trial procedure developed. Even then, the record suggests that some adoptive parents were wary of invitations to join the lawsuit.

Under the circumstances, the court appropriately gave the guardian wide power to monitor, investigate, and report on, *inter alia*, possible conflicts within and among the involved families. Some of these responsibilities reasonably included legal research and analysis. Thus, the cost award was not simply another "form" of the practice banned in *Alyeska, compare Jordon v. Gilligan*, 500 F.2d 701 (6th Cir. 1974). Instead, the allowance of legal expenses was within the trial court's discretion in permitting the guardian to meet his extensive obligations to the court. For the same reasons, we decline to disturb the trial court's decisions to continue the guardian's service after the arrival of the adoptive parents and to compensate the guardian accordingly. The trial court is best positioned to ascertain when the circumstances requiring the guardian's original appointment—the potential conflicts of interest, etc.—are such that the guardian's services are no longer required.

We conclude that the District Court did not abuse its discretion in taxing costs against Lockheed for the guardian *ad litem* services performed up to and through *Schneider, Marchetti,* and *Zimmerly II.* Although Lockheed has argued that there currently exists no check upon the guardian, we think that the court's scrutiny of the fee requests has been an adequate check under the circumstances, up to this point. With many of the parents now intimately involved in the litigation, it may become increasingly difficult for the court to discern each individual plaintiff's need for the guardian's services in each particular case. Therefore, for all services rendered from the date of this judgment forth,[25] the guardian should be required to show that the particular plaintiff had need of the particular services for which the guardian seeks a fee. This record will facilitate the court's supervision of the guardian's fees.

**B. Prejudgment Interest**

Plaintiffs were awarded prejudgment interest of $102,358.77 in *Schneider,* $222,711.73 in *Marchetti,* and $120,192.05 in *Zimmerly II.* Lockheed contends that an award of prejudgment interest in a tort action is impermissible under District of Columbia law. We agree.

A federal court sitting in diversity must look to local law to determine the availability of prejudgment interest. 28 U.S.C. § 1961 (Supp. III 1979). *See Klaxon Co. v. Stentor Electric Mfg. Co.,* 313 U.S. 487, 497, 61 S.Ct. 1020, 1022, 85 L.Ed. 1477 (1941); *In re Air Crash Disaster Near Chicago, Ill.,* 644 F.2d 633 at 637 (7th Cir., 1981). The federal courts "are not free to devise a different measure of damages pursuant to [their] 'general equitable powers,'" *In re Crash,* at 637. The local law applicable in these cases is that of the District of Columbia. *In re: Air Crash Disaster Near Saigon, South Vietnam on April 4, 1975,* 476 F.Supp. 521, 529 (1979).

15 D.C.Code § 109 (1973) provides:

25. The date of judgment is the date on which we issued our Judgment with an opinion to follow, May 19, 1981. *See* note 1 *supra.*

In an action to recover damages for breach of contract the judgment shall allow interest on the amount for which it is rendered from the date of judgment only. This section does not preclude the jury, or the court, if the trial be by the court, from including interest as an element in the damages awarded, if necessary to fully compensate the plaintiff. In an action to recover damages for a wrong the judgment for the plaintiff shall bear interest.

[As added Aug. 30, 1964, 78 Stat. 677, Pub.L. 88–509, § 3(b)(1).] This section generally limits interest to the postjudgment period. The second sentence appears to provide an exception. It is unclear, however, whether the exception refers only to contract actions specified in the first sentence, or to both contract and tort actions. The location of the second sentence in the paragraph, followed by the provision in the third sentence that the *judgment* shall bear interest in tort actions, suggests that the exception applies only to contract actions. Our interpretation is confirmed by the statute's legislative history and by the case law.

At common law, judgments in the District of Columbia did not bear interest, regardless of the nature of the cause of action. *Washington and Georgetown R.R. v. Harmon's Administrator*, 147 U.S. 571, 584–85, 13 S.Ct. 557, 561, 37 L.Ed. 284 (1893). Congress, by the Act of March 3, 1901, altered the common law. The language of the Act was virtually identical to that appearing today in section 15–109:

In an action to recover damages for breach of contract the judgment shall allow interest on the amount for which it is rendered from the date of the judgment only; but nothing herein shall forbid the jury, or the court, if the trial be by the court, from including interest as an element in the damages award, if necessary to fully compensate the plaintiff. In an action to recover damages for a wrong the judgment for the plaintiff shall bear interest.

[Act of March 3, 1901, ch. 854, § 1185, 31 Stat. 1378.]

Thus, since 1901, judgments in actions "to recover damages for a wrong," along with actions founded in contract, have carried postjudgment interest from the judgment as a matter of right in the District of Columbia. The 1901 legislation maintained, however, the traditional distinction between actions in contract and those in tort, at least with respect to prejudgment interest. While the Act provided for prejudgment interest in actions founded in contract, it did not do so in tort cases.

The current provision, section 15–109, is simply a reenactment of the original 1901 legislation. In the process of codification in 1964, the first sentence of the earlier version was split in two. Thus, where the prejudgment interest clause previously was part of the same sentence as the contract provision, separated only by a semicolon, it now stands as a separate sentence. There is no reason to believe that Congress intended any substantive change from the rule against prejudgment interest in tort actions by this alteration of punctuation in 1964.[26] Nor is this change in punctuation the "plain and unambiguous" expression of legislative intent that is required under "settled rules of construction" before Congress will be deemed to have changed the common law principle precluding prejudgment interest in tort actions. *Harmon's Administrator*, 147 U.S. at 587, 13 S.Ct. at 562.

We also note that there is a conspicuous absence of any reported tort case in the District of Columbia since the original enactment of the 1901 legislation that even mentions, much less awards, prejudgment interest. While this fact is not determinative, it certainly recommends, along with the legislative history of section 15–109, the conclusion that we have reached.

 In summary, we hold that neither common law nor the District of Columbia Code provides for the award of prejudg-

---

**26.** *See, e. g., King v. United States*, 379 U.S. 329, 336, 85 S.Ct. 427, 431, 13 L.Ed.2d 315 (1964) (division in revised statutes of previous-ly unified provision into separate sections "did not work any change in the purpose or meaning") (citation omitted).

ment interest in tort actions in the District of Columbia.

## C. September 14, 1979 Stipulation

Lockheed argues that the District Court incorrectly interpreted the stipulation of September 14, 1979 entered into by defendant and the plaintiffs. *See Schneider* J.A. at 166–68. The paragraph in question states that "Lockheed shall ... pay to counsel for the plaintiff the greater of (a) thirty percent (30%) of the amount of such *judgment* or (b) fifty (50%) of the largest settlement offer ... notwithstanding any appeal so taken." *Schneider* J.A. at 167 (emphasis added). Lockheed contends that the term "judgment" should be read to exclude the fees and costs of the guardian *ad litem* and *amicus curiae*, as well as the amount awarded by the District Court as prejudgment interest.

 The District Court's interpretation of the stipulation is, we believe, correct. Therefore, even though we have found the District Court's award of prejudgment interest and *amicus* costs and fees to be error, the stipulation, with its explicit negation of any refund obligation as to any part of the judgment upon appellate reversal, does not contemplate that those items are refundable.

## IV

Appellees have raised several matters on cross-appeal which deserve some mention. All three appellees challenge the court's computation of prejudgment interest, asserting that it should have been computed from the date of the accident and not the date selected by the District Court. Inasmuch as we hold herein that prejudgment interest was unavailable in these cases in any event, however, the cross-appeals are mooted.

The remaining cross-appeals were raised primarily by James Zimmerly, and were conditioned upon this court's reversal of the three trials. They involve challenges to (1) one section of the Comprehensive Pretrial Order which excludes pictures and newsreels of the crash scene, (2) other evidentiary rulings, (3) the propriety of the settlement that occurred during *Zimmerly I*, and (4) the court's computation of postjudgment interest in *Zimmerly II*. To our mind, it would be inappropriate for this court to pass upon those questions at this point in the litigation. The District Court rulings now being appealed were clearly premised on the unique facts of the three cases, now reversed and remanded for new trials, and on the Comprehensive Pretrial Order allowing collateral estoppel, also reversed in this opinion. In light of our holdings today, the court will undoubtedly reconsider many of its evidentiary and other rulings *sua sponte*, and the appellees will be free to address their complaints to that court. We hold that these cross-appeals are properly addressed to the district court that retries *Schneider, Marchetti,* and *Zimmerly*.

## V

We have attempted in this opinion to resolve many of the complex legal questions presented by these cases, both for the purpose of settling the instant disputes and as a guide for courts confronted with related cases in the near future. Although this opinion will, in practical terms, require the retrial of several cases, it is our hope that the setting forth of our views on many of these questions will speed these cases to swift and proper resolution.

In conclusion, we reverse and remand *Schneider, Marchetti,* and *Zimmerly* for new trials, on the grounds that the admission of Exhibit 109 in *Schneider* and *Marchetti* was prejudicial error in both trials and fatal to the collateral estoppel order that was the foundation of *Zimmerly II*. We also find that the Comprehensive Pretrial Order of Oct. 30, 1980, is invalid inasmuch as it prevents Lockheed from presenting evidence showing that the accident was

insufficient to cause MBD in the infant plaintiffs.

As to the proper calculation of costs and interest in these cases, we hold that the guardian *ad litem* fees were properly allowed by the District Court and may be awarded in the future under the conditions set forth herein. The amicus fees and prejudgment interest were, in our view, improperly taxed against Lockheed. Last, we hold that the Stipulation of Sept. 14, 1979 allows these plaintiffs to retain thirty percent of the total District Court judgment.

*It is so ordered.*